UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD TURNBULL,

               Plaintiff,

   -against-

JPMORGAN CHASE & CO.,

               Defendant.

Index No. _____

**COMPLAINT AND
JURY DEMAND**

      Plaintiff Donald Turnbull, by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for his Complaint alleges as follows:

### PRELIMINARY STATEMENT

      1.     JPMorgan (hereafter "JPMorgan" or "Bank") fired Donald Turnbull from his job as a commodities trader because, by cooperating in good faith with a federal investigation into the Bank's trading practices, Mr. Turnbull shed light on a range of the Bank's institutional failures regarding manipulative trading practices over several years.

      2.     Concerned that Mr. Turnbull had shared information about these failures with the Department of Justice ("DOJ") and might continue to do so, JPMorgan subjected Mr. Turnbull to a pretextual internal investigation, the outcome of which was preordained. JPMorgan denied Mr. Turnbull the time and resources to defend against the Bank's false charges, rejected Mr. Turnbull's requests to account for all relevant data, and rushed its "investigation" to a foregone conclusion. It abruptly placed Mr. Turnbull on leave on October 31, 2019. The Bank then secretly terminated him and cancelled his unvested stock.

      3.     JPMorgan is liable under Section 806 of the Sarbanes-Oxley Act ("SOX"),

1

18 U.S.C. § 1514(A), for its retaliatory adverse actions against Mr. Turnbull.

4.     At the time the Bank terminated him, in October 2019, Mr. Turnbull had been a prized employee of JPMorgan for nearly fifteen years. During his time there, Mr. Turnbull quickly rose through the ranks of the Bank's precious metals group, and in April 2018 had reached the prestigious title of "Managing Director" in Precious Metals Trading. Throughout his tenure, JPMorgan tasked Mr. Turnbull with increasing responsibility and continually lauded his exceptional business judgment, trading acumen, and professional integrity.

5.     By October 2018, the DOJ was engaged in an investigation into unlawful trading practices, including "spoofing," on JPMorgan's precious metals desk. In the context of commodities trading on the futures market, "spoofing" entails placing a futures contract order with the intent to cancel that order before execution. Designed to manipulate the market by creating false impressions of increased supply or demand, spoofing allows traders to deceive other market participants.

6.     When the DOJ invited Mr. Turnbull for an interview in 2019, he agreed, and, in response to prosecutors' questioning, provided the DOJ with information that revealed significant, multi-year lapses in JPMorgan's trading oversight mechanisms and enforcement judgments.

7.     In August 2019, the DOJ charged four JPMorgan precious metals traders, alleging spoofing and other market misconduct based on tens of thousands of trading sequences between 2008 and 2016.

8.     JPMorgan treated the six individuals ultimately indicted far more favorably than it treated Mr. Turnbull, whose trading practices bear no relationship to these individuals' admitted and alleged conduct. JPMorgan released three indicted individuals favorably from employment,

one resigned on the day he pleaded guilty to charges of conspiracy and spoofing, and JPMorgan terminated the remaining two only after their indictments were unsealed.

9.      Mr. Turnbull never engaged in spoofing, and JPMorgan had never asked to consult with Mr. Turnbull about his own trading conduct prior to 2019. But in October 2019—days after an extensive Bank interview with Mr. Turnbull during which the Bank learned the nature of the information Mr. Turnbull had shared with government prosecutors—JPMorgan launched a retaliatory campaign against Mr. Turnbull. Alarmed by the perception of its institutional culpability, JPMorgan hurried through a faux inquiry into Mr. Turnbull's unimpeachable trading practices. Based on a pretextual narrative that the Bank had lost confidence in him, the Bank terminated him, cancelled his unvested stock, and threatened to claw back his prior compensation. This sharply disparate treatment makes JPMorgan's retaliation against Mr. Turnbull crystal clear. The Bank's narrative was and is false. Mr. Turnbull's termination is unlawful.

## THE PARTIES

10.      Plaintiff Donald Turnbull is a graduate of Yale University with a Bachelor of Arts degree in Economics and International Studies. Mr. Turnbull joined JPMorgan as an analyst in 2005 and was made a Managing Director within JPMorgan's Precious Metals Trading practice in April 2018.

11.      Defendant JPMorgan Chase & Co. is an American multinational investment bank and financial services holding company headquartered in New York City at 383 Madison Avenue, New York, New York 10017. JPMorgan is traded on the NASDAQ and the New York Stock Exchange. With assets exceeding $3.2 trillion, JPMorgan is the largest bank in the United States and the seventh largest bank in the world. Among other things, JPMorgan operates a

global commodities trading business that trades precious metals futures contracts and options. JPMorgan is a financial institution pursuant to 18 U.S.C. § 20.

## JURISDICTION

12.     This Court has subject matter jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 because this action arises under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A.

13.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims occurred in this judicial district.

## JURY DEMAND

14.     Plaintiff demands trial by jury in this action.

## FACTUAL ALLEGATIONS

### I.     <u>Donald Turnbull</u>

15.     Mr. Turnbull graduated from Yale University, *cum laude*, in three-and-a-half years, earning distinction in both of his majors.

16.     After graduation, Mr. Turnbull joined JPMorgan as an analyst in 2005 and fulfilled various roles on the Bank's precious metals desk for nearly 15 years. He was enthusiastic about his work and loved his job.

17.     Around 2014, JPMorgan leadership asked Mr. Turnbull to represent JPMorgan on the Management Committee of the London Platinum and Palladium Market trading association and to represent Precious Metals on a JPMorgan "culture carrier" committee (both of which he did)—acknowledgments of Mr. Turnbull's professionalism and integrity.

18.     Mr. Turnbull's consistent outperformance as the platinum group metals trader led to his promotion in role in 2014 to lead the precious metals rates portfolio, a position from which

he led four consecutive record years of financial performance from 2015 onwards.

19.      Throughout his tenure at JPMorgan, Mr. Turnbull received eight promotions, including moving from desk junior, to lead platinum group metals trader, to lead precious metals rates trader, and from trader to local desk head before his 2017 appointment as Global Head of Precious Metals Trading. His promotions culminated in his 2018 promotion to Managing Director.

20.      Mr. Turnbull's yearly performance reviews further reflected his excellence. He was regarded as best in class, with high attention to detail and having sound judgment for identifying and escalating control issues appropriately. In 2018, Mr. Turnbull was deemed "one of [the] most diligent and controlled traders," who is "exceptional at both managing risk and communicating a balanced view of these risks to senior management."

21.      In short, JPMorgan considered Mr. Turnbull a "culture carrier"—an employee who maintained high standards of integrity and embodied the values to which the Bank aspired.

## II.     The DOJ Investigates Spoofing at JPMorgan's Precious Metals Desk

22.      By October 2018, the DOJ had begun to investigate the JPMorgan precious metals desk for allegedly engaging in an illegal trading practice known as "spoofing."

23.      In the context of commodities trading, spoofing refers to a trader's placement of an order to buy or sell futures contracts with the intent to cancel that order before it is executed.

24.      Spoofing is designed to manipulate the market and yield favorable prices for the spoofing trader, his employer, and/or his clients.

### A.  Futures Trading of Precious Metals and the Practice of Spoofing

25.      The trading of precious metals—including gold, silver, platinum, and palladium, all naturally occurring high-value metals—frequently involves the purchase and sale of "futures

contracts." A "futures contract" is a standardized financial agreement to buy or sell a particular precious metal at a fixed price, to be (i) delivered and (ii) paid for at a specific date in the future.

26.     Futures contracts protect against—and profit from—fluctuating prices in the commodities market by insulating buyers and sellers from shifts in supply and demand. Producers and consumers of commodities use futures contracts to stabilize revenues or costs. Financial institutions, investment banks, and individual traders use futures contracts to hedge client business and generate trading profits. JPMorgan is one such market participant.

27.     Futures contracts are traded only on certain designated and regulated exchanges, all governed in the United States by the Commodity Futures Trading Commission ("CFTC"). As a result, futures contracts are highly standardized.

28.     According to the DOJ, since the advent of financial markets, some traders have attempted to manipulate them. One mechanism for market manipulation is known as spoofing, which the Wall Street Reform and Consumer Protection Act, commonly known as the Dodd-Frank Act, defined as "the illegal practice of bidding or offering with intent to cancel before execution." 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2).

29.     According to the DOJ, by placing large orders with no intent to execute them, spoofers create an illusion of increased demand or supply for a particular commodity. This illusion may, in turn, cause prices to change as the market responds to the perceived one-sided shift. A large order to buy—or an appearance of greater demand—may increase prices. A large order to sell—or an appearance of greater supply—may, in turn, decrease them.

30.     According to the DOJ, typically, a spoofer will place a genuine order on one side of the market, and multiple and/or larger deceptive orders on the other. After the market responds to the deceptive orders and the genuine order is filled, the spoofer will rapidly withdraw

the deceptive orders before execution. The trader who spoofs therefore benefits from market manipulation by leveraging deceptive orders to yield a better fill price on genuine orders.

**B. The DOJ Indicts Four JPMorgan Employees for Spoofing**

31.     According to the DOJ's indictments, thirteen employees of JPMorgan's precious metals desk are alleged to have engaged in market manipulation between 2008 and 2016. Two pleaded guilty to spoofing-related charges. Four are defendants in a federal indictment. Seven are unindicted co-conspirators in that indictment. Mr. Turnbull was neither indicted nor among the alleged co-conspirators in the original August 2019 or superseding November 2019 indictments.

32.     The Anti-disruptive Practices Authority of the Dodd-Frank Act became effective on July 16, 2011. From that time forward, regulators and federal prosecutors began to crack down on alleged spoofing activity. In conjunction with that effort, over several years beginning in 2013, the CME investigated certain individuals on JPMorgan's precious metals desk for potential spoofing conduct, which resulted in fines and/or suspensions of more than one trader. Later, the DOJ began investigating the same and similar conduct.

33.      On November 14, 2019, attorneys in the Criminal Division of the DOJ filed a superseding indictment against four JPMorgan employees as well as seven unindicted co-conspirators in the Northern District of Illinois, Eastern Division.

34.     Broadly, the superseding indictment alleges a racketeering conspiracy between the defendants and their co-conspirators pursuant to 18 U.S.C. §§ 1961(1) and 1961(5), consisting of conduct which violates 18 U.S.C. § 1343 (wire fraud affecting a financial institution) and 18 U.S.C. § 1344(1) (bank fraud).

35.     According to the superseding indictment, the "unlawful trading practices" at issue constitute spoofing: *i.e.*, "plac[ing] orders to buy and sell precious metals futures contracts with

the intent to cancel those orders before execution, including in an attempt to artificially affect prices and to profit by deceiving other market participants."

36.     The DOJ alleged that 54,456 trading sequences—each of which may contain multiple orders and still more individual contracts, or "lots"—"underlie the charges" in the superseding indictment. In other words, the defendants and their co-conspirators are alleged to have engaged in spoofing in more than fifty-four thousand trading sequences over the course of eight years.

37.     Two of these defendants are separately alleged to have "placed *thousands* of Spoof Orders or Layered Spoof Orders" between 2008 and 2015.

38.     According to the indictment, the defendants and their co-conspirators allegedly used various "spoofing" techniques to inject false and misleading information about supply and demand into the precious metals market for the purpose of deceiving market participants and manipulating prices to benefit their clients, their employer, and themselves.

39.     According to the indictment, the defendants and their co-conspirators also allegedly defrauded clients of JPMorgan by engaging in practices known as "barrier running" and "barrier defending." A "barrier option" is a type of option contract with a value dependent on whether the underlying asset reaches or exceeds a predetermined price during the option's lifetime. "Barrier running" entails manipulating the asset's market price *toward* a price point to trigger a barrier option. "Barrier defending" entails, conversely, manipulating the asset's market price *away from* a price point to avoid triggering a barrier option. The indictment alleges that the defendants and their co-conspirators engaged in these illegal practices in order to yield profits for JPMorgan.

8

### C. Mr. Turnbull Cooperates Fully in the DOJ's Investigation of JPMorgan

40.    Mr. Turnbull never engaged in "spoofing," "barrier running," "barrier defending," or any other form of market manipulation.

41.    Since the DOJ began its far-reaching investigation of JPMorgan, Mr. Turnbull has cooperated fully. He spoke with investigators at length during three meetings between March and August 2019, answering every question investigators asked.

42.    JPMorgan knew that Mr. Turnbull had met with the DOJ on all three occasions.

43.    JPMorgan subsequently asked to interview Mr. Turnbull regarding his knowledge of the conduct underlying the investigation and his own trading conduct. Mr. Turnbull also cooperated fully with the Bank.

### III.    JPMorgan Terminates Mr. Turnbull In Retaliation for Mr. Turnbull's Protected Activity

44.    Before JPMorgan learned about Mr. Turnbull's potential knowledge of market manipulation at the Bank, JPMorgan viewed him as one of its most valuable traders. Supervisors praised Mr. Turnbull's handling of risks and controls, and regularly gave him exemplary reviews, often awarding him the Bank's top internal annual rating of E ("exceeds expectations").

45.    No JPMorgan compliance officer or manager had ever expressed an interest in meeting with Mr. Turnbull to discuss his impeccable trading practices prior to October 2019.

46.    Mr. Turnbull never imagined that JPMorgan would terminate him on the pretextual basis that he had engaged in trading misconduct.

47.    But that is exactly what happened in October 2019. That month, in retaliation for Mr. Turnbull's report of events relating to the DOJ investigation, the Bank took a number of rushed adverse actions against Mr. Turnbull in violation of the Sarbanes-Oxley Act.

### A. JPMorgan's Adverse and Retaliatory Employment Actions

48.    JPMorgan took the following adverse and retaliatory employment actions against Mr. Turnbull between October 7, 2019 and October 31, 2019.

49.    Mr. Turnbull worked out of London for the two weeks ending Friday October 4, 2019 to assist a team that had become short-staffed as a result of the DOJ indictments. JPMorgan asked that Mr. Turnbull sit for an interview on Monday October 7, 2019—immediately upon his return to New York.

50.    Before then, no one at the Bank had suggested to Mr. Turnbull that his trading conduct warranted scrutiny.

51.    Although the Bank "flagged" a handful of innocuous trading sequences for review at this meeting, most of the discussion involved Mr. Turnbull's knowledge of and opinions about his colleagues and the Bank's control mechanisms. In response to these inquiries, Mr. Turnbull highlighted severe, chronic institutional failures at JPMorgan.

52.    Although the meeting was scheduled to take only 2.5 hours, Mr. Turnbull answered questions for nearly five hours.

53.    Fearing Mr. Turnbull would repeat the contents of these internal interviews to the DOJ—and out of concern for what he had already told investigators—JPMorgan advanced a retaliatory campaign against Mr. Turnbull. On October 18, 2019, just 11 days after the initial interview, JPMorgan told Mr. Turnbull that the Bank wanted to discuss additional trading sequences (including those already reviewed on October 7) on October 24, 2019.

54.    On October 21, 2019—three days before the scheduled meeting— JPMorgan informed Mr. Turnbull that, rather than answer questions from management, Mr. Turnbull would be required to walk through every one of the "flagged" trading sequences in detail.

55.    Mr. Turnbull had already explained to the Bank that he could not recall any of the individual sequences, which all occurred more than six years before the scheduled meeting. Nevertheless, in the spirit of cooperation, he prepared for the interview.

56.    On the evening of October 23, 2019—the day before the scheduled meeting—JPMorgan flagged an additional subset of order sequences for discussion. Although certain of these sequences were duplicative of the previously flagged instances, Mr. Turnbull incorporated them into his review.

57.    On October 24, 2019, JPMorgan conducted its interview of Mr. Turnbull. Though the meeting was scheduled to take only three hours, it lasted nearly seven. During the meeting, JPMorgan invoked "spot data" that Mr. Turnbull had not previously seen and that JPMorgan had not provided to him before the meeting. "Spot data" includes a trader's over-the-counter ("OTC") trades as well as his closely-timed futures trades; it is used to inform how a trader's exposure to a metal's price (known as "delta") evolves.

58.    JPMorgan's reliance on the spot data made no sense. The data could not support inferences of misconduct, and it was decontextualized from other relevant market and positional information, including option positions, unfulfilled OTC orders, and developments among exogenous orders in the OTC market.

59.    The data was also flawed and internally inconsistent. Curiously, it incorporated trades completed by individuals who had been indicted or alleged as co-conspirators and whose conduct had nothing to do with Mr. Turnbull's. When Mr. Turnbull questioned the conflation of those traders' data with his own, JPMorgan investigators—appearing to lose confidence in the integrity of the data—brushed it aside.

60.    At the end of the seven-hour October 24, 2019 interview, JPMorgan directed Mr.

11

Turnbull to resume the discussion the following day. On October 25, 2019, JPMorgan continued to question Mr. Turnbull by phone for an additional hour, focusing on a subset of Mr. Turnbull's orders.

61.    Later that day, JPMorgan informed Mr. Turnbull that he had until the morning of the following business day to supplement the existing record if he wished to do so.

62.    By the morning of October 29, 2019, Mr. Turnbull supplemented the record with an affirmative defense of his trading conduct. The Bank apparently disregarded this supplement.

63.    At the end of the day on October 31, 2019, Mr. Turnbull learned that he had been placed on leave.

64.    On November 3, 2019, Mr. Turnbull logged into his emails to review benefits-related information due to his wife's ill health.

65.    At that time, he opened an email from his supervisor. The email stated, "I will be having a quick call tomorrow morning at 730am est [sic] to brief the participants on Don's departure from the Firm and [another employee's] new role as the head of Precious Metals Trading."

66.    JPMorgan had not yet informed Mr. Turnbull that he had been terminated or otherwise "followed up" with respect to his placement on leave. Mr. Turnbull first learned of his apparent "departure" on a Sunday afternoon through an email directed to other people. JPMorgan informed Mr. Turnbull's peers and colleagues, and intended to inform his own team, before telling him of his termination.

67.    In fact, JPMorgan's decision to place Mr. Turnbull "on leave" was made after the decision to execute his baseless termination. JPMorgan's benefits department sent Mr. Turnbull a letter indicating that his healthcare coverage would end "[a]s a result of your *Termination* on

October 31, 2019" (emphasis added)—but October 31 was the same day JPMorgan had placed Mr. Turnbull "on leave." The Bank's retaliatory treatment of Mr. Turnbull did not end with his termination.

68.    Despite knowing that Mr. Turnbull's wife suffered from severe health issues, JPMorgan did not notify Mr. Turnbull of his FMLA eligibility of entitlements.

69.    JPMorgan cancelled Mr. Turnbull's substantial unvested shares.

70.    JPMorgan cut off Mr. Turnbull's salary without notice.

71.    JPMorgan awarded Mr. Turnbull no incentive compensation despite an exemplary 2019 performance in the face of severe staff shortages.

72.    JPMorgan offered Mr. Turnbull no severance package.

73.    JPMorgan did not provide Mr. Turnbull with any written notice of the reason for his termination.

74.    The only written document JPMorgan sent to Mr. Turnbull beyond standard benefit-related notices was a threat to claw back certain portions of his compensation.

75.    JPMorgan claimed it terminated Mr. Turnbull because certain of the flagged trading sequences did not meet the Bank's expectations. Despite repeated requests from Mr. Turnbull's counsel, the Bank did not identify which sequences failed to meet expectations until almost nine months after his termination.

76.    Of the approximately 53,000 orders reviewed over a 9.5-year period, JPMorgan cited 14 instances as conduct that "could be perceived as spoofing" as the founding basis for his termination.

77.    On information and belief, JPMorgan took these adverse actions because management feared the information Mr. Turnbull possessed, the views he expressed, and the

threat these posed to the Bank's reputation.

78.    Because Mr. Turnbull disclosed damaging information to the DOJ, JPMorgan falsely claimed a "loss of confidence" in Mr. Turnbull to justify his termination and damage his credibility.

## IV.    Mr. Turnbull's Protected Activity Was a Contributing Factor to His Termination from JPMorgan

79.    JPMorgan terminated Mr. Turnbull in secret. Mr. Turnbull, who served the Bank for nearly fifteen years with excellence and integrity, learned he had been fired from an email intended only for others. The Bank did not offer Mr. Turnbull an exit interview; it never sent him a termination letter. And, despite repeated requests for an explanation from counsel, JPMorgan never gave Mr. Turnbull a substantive reason for his termination, merely invoking vague references to the potential appearance of misconduct.

80.    The reasons are clear. Mr. Turnbull's trading data and communication records had not changed between 2013 and October 2019. What changed was Mr. Turnbull's disclosure to the DOJ of information about JPMorgan's serious institutional failures to provide proper guidance, surveillance, and enforcement on trading conduct—information which threatened JPMorgan's reputation and bottom line.

81.    Those disclosures were at least a contributing factor in Mr. Turnbull's termination.

82.    All of the trading sequences on which JPMorgan purportedly based its termination of Mr. Turnbull occurred more than six years before the Bank took adverse actions against him.

83.    The Bank's retaliatory campaign was launched approximately two months after

Mr. Turnbull's last meeting with the DOJ—and his termination came just 24 days after JPMorgan learned the substance of Mr. Turnbull's experiences with the Bank's flawed oversight and controls.

### A. JPMorgan Knew That Mr. Turnbull Had Harmed and Could Continue to Harm Its Reputation

84.    JPMorgan knew that Mr. Turnbull had communicated information about severe lapses in the Bank's legal and compliance training, monitoring, assessment, and enforcement to DOJ investigators. The Bank knew that Mr. Turnbull could continue to disclose information about its years-long practice of overlooking, defending, and, in some cases, sanctioning and profiting from trading conduct that would later be alleged to be unlawful and manipulative.

85.    Because of this, JPMorgan was motivated to terminate Mr. Turnbull and diminish his credibility.

86.    JPMorgan learned the following elements of Mr. Turnbull's knowledge, experience, and opinions, which exposed the Bank to regulatory and legal discipline:

a.  JPMorgan did not train commodities employees to avoid spoofing until late 2013, more than three years after Congress moved to outlaw the practice.

b.  In 2014, JPMorgan investigated a London-based trader (Trader A[1]) for spoofing. Mr. Turnbull had no knowledge of Trader A's conduct and, at the time, no reason to believe he had engaged in spoofing. Nevertheless, immediately following this development, Mr. Turnbull escalated concerns about the potential spoofing of a New York employee (Trader B) to his manager based on Trader B's reputation for rapid order entry and cancellation while on both sides of the market.

c.  In response, Mr. Turnbull's manager told him that the Bank had already vetted Trader B's conduct and approved his methods for continued use.

---

[1] Plaintiff refers to certain former JPMorgan traders as Traders A, B, and C throughout his Complaint.

d.   Mr. Turnbull subsequently received information from a senior employee and a compliance officer regarding the investigation of Trader A. In Mr. Turnbull's view, these two senior commodities employees approached him to discuss Trader A's trading practices because they viewed Mr. Turnbull as a trader who did not spoof, followed rules, and prized professional integrity. They relayed the following information:

    i.   According to the senior employee, the Bank might have shown Trader A more leniency had he acknowledged that his trading practices were designed to combat high-frequency trading algorithms.

    ii.   According to the compliance officer, Trader A claimed that "everyone" on JPMorgan's precious metals desk used the same trading strategies he did. The compliance officer further stated that Bank investigators reviewed the trading conduct of all precious metals traders in mid-2014 and concluded, to the contrary, that "no one was trading like [Trader A] was trading."

e.   Later in 2014, Mr. Turnbull learned that the CME (the primary exchange on which the JPMorgan precious metals team traded futures) was investigating Trader B for suspected spoofing. He eventually learned that the CFTC was also investigating Trader B.

f.   For that reason, that same year, Mr. Turnbull again asked his manager whether Trader B's conduct might constitute spoofing. Again, Mr. Turnbull's manager assured him that the Bank supported Trader B's trading practices.

g.   In 2017, Mr. Turnbull learned that the CME suspended Trader B for two weeks and that JPMorgan paid a fine levied against Trader B, whom the DOJ later charged with market manipulation.

h.   Mr. Turnbull knew that the Bank had investigated another trader (Trader C) for improper trading conduct. Mr. Turnbull believed the scrutiny was for potential spoofing and learned that the Bank gave Trader C a verbal warning. Trader C later pleaded guilty to spoofing.

i.   Mr. Turnbull believed that the Front Office Supervisory Report, a recent mechanism that purportedly monitored potential market manipulation, was a "woefully inadequate" box-ticking exercise that captured too many false positives to meaningfully detect improper trading practices. Although Mr. Turnbull

16

suggested multiple improvements to the report, the Bank told him his recommendations were too complex and that managers would "make do" with the unrevised report.

87.     After the unsealing of the indictment and Mr. Turnbull's October 7, 2019 interview, JPMorgan saw the writing on the wall. Mr. Turnbull's account lent credibility to the notion that the Bank itself was the most culpable entity in the alleged conspiracy; the risk he posed had to be neutralized.

88.     Despite having backed the defendants for over a decade, including during the DOJ's investigation, the Bank had to distance itself from the implicated traders. On information and belief, JPMorgan sought to reframe the narrative as though the defendants operated in their allegedly manipulative manner without JPMorgan's knowledge.

89.     Mr. Turnbull's 15-year tenure at the Bank belies this fiction.

90.     In order to discredit Mr. Turnbull and defuse the threat his knowledge posed, the Bank terminated him in retaliation for his cooperation with the DOJ.

91.     JPMorgan did so despite Mr. Turnbull's outstanding record on the precious metals desk and unimpeachable trading practices.

**B.  JPMorgan's Purported Reason for Terminating Mr. Turnbull Was Pretextual**

92.     To cover up its real reason for ousting Mr. Turnbull, JPMorgan pretended it had terminated him for spoofing. Of the more than tens of thousands of orders that Mr. Turnbull placed over a 9.5-year period, the Bank cherry-picked a handful of trading sequences that it suggested "could be perceived as" spoofing.

93.     This "justification" was pretextual.

94.     All available evidence shows that Mr. Turnbull did not engage in spoofing on the

occasions JPMorgan flagged—and that JPMorgan knew he had not done so.

95.     While JPMorgan flagged certain trades in which Mr. Turnbull was on both sides of the market, there is nothing inherently suspect about this scenario. In his capacity as a "market-maker" (that is, one who quotes financial market bids *and* offers), Mr. Turnbull regularly managed opposing orders for reasons ranging from market-making (quoting with intent to trade either side), capturing spread (seeking to buy low and sell high on a single financial instrument around the same time), "jobbing" a position (seeking to capture spread to improve profitability while accruing or reducing a position), and arbitrage (trading based on opportunities in a related market while accruing or reducing a position). Mr. Turnbull engaged in these strategies regularly, often more than one simultaneously, and occasionally made mistakes as well (what traders refer to as a "fat finger"). The existence of orders on both sides of the market does not, in and of itself, suggest spoofing.

96.     Several objective factors also shed light on whether a trader engaged in spoofing, including, but not limited to: (i) the number of "flagged" sequences relative to the trader's entire order history; (ii) the amount of money the trader, his clients, and the Bank stood to gain in the flagged sequences; and (iii) the speed with which those sequences were executed, both in absolute terms and relative to non-flagged sequences.

97.     Each factor affirms that Mr. Turnbull was not spoofing on any of the occasions the Bank flagged.

    i.     **Number of flagged sequences relative to Mr. Turnbull's order history**

98.     Traders who are suspected to have engaged in spoofing generally do so often. For example, the DOJ stated that 54,456 trading sequences—and likely many more orders— "underlie the charges" in the superseding indictment. Likewise, two of the DOJ defendants

18

allegedly "repeatedly engaged in" spoofing by "placing *thousands* of orders with the intent to cancel them."

99.     In contrast, JPMorgan reviewed only a handful of order sequences with Mr. Turnbull—a small fraction out of many tens of thousands of orders he placed over the relevant period. The 14 sequences JPMorgan flagged constitute *less than 0.03 percent* of Mr. Turnbull's total trading activity over the period examined. Traders who spoof tend to do so frequently at regular intervals, as a pattern. But Mr. Turnbull's "flagged" orders are so rare as to be statistically anomalous: one out of every 3,786 orders does not remotely constitute a "trading pattern." His trading history is nothing like the records set forth in the superseding indictment.

100.    The stratospheric difference in volume between Mr. Turnbull's scant handful of "flagged" trades and the vast array completed by other traders is particularly evident by comparison with examples in the indictment. One trader—indicted based on 38,146 sequences— in a single sequence placed *twenty-two* "deceptive" orders. Similarly, a supervisor—indicted based on 3,603 sequences—in a single sequence placed *thirty-two* "deceptive" orders. In single instances, both traders placed more orders that yielded criminal charges than Mr. Turnbull, over his entire career, placed orders that JPMorgan belatedly claims "could be perceived as spoofing."

### ii.    Value of the flagged sequences relative to Mr. Turnbull's P&L

101.    The *de minimis* financial value of Mr. Turnbull's flagged trading sequences further indicates that he was not engaged in spoofing.

102.    Traders engage in spoofing to make more money for themselves, their employers, and their clients. Absent financial gain, there is no reason to spoof.

103.    Mr. Turnbull's flagged trades would have earned negligible income either for the Bank or for himself.

104.     Had Mr. Turnbull spoofed on all 14 "flagged" occasions—and he did not spoof on any—the effect on his performance metrics would have been imperceptible. Assuming *arguendo* that Mr. Turnbull had been spoofing, the strategy would have achieved a marginal revenue ("P&L") of less than an average of $700 per year over the four years in question.

105.     Likewise, assuming a rate of compensation proportional to Mr. Turnbull's P&L, the alleged spoofing would have yielded less than $28 per year after taxes for Mr. Turnbull himself, an amount for which he would not have plausibly risked his job, career, or reputation.

###     iii.     Speed with which the flagged orders were cancelled

106.     The lengths of time for which Mr. Turnbull kept his flagged orders open and working also show that he was not spoofing.

107.     Traders who spoof cancel their deceptive orders quickly lest they be inadvertently executed, eliminating or reversing any potential financial gains.

108.     Traders identified by law and regulatory enforcement routinely cancelled "deceptive" orders well under a second after placement. Not one of Mr. Turnbull's 14 flagged sequences contains an order cancelled in under *two* seconds. Every order placed intentionally was done so with an intent to trade.

### C.  JPMorgan Treated Mr. Turnbull More Severely Than Individuals Indicted or Implicated as Co-Conspirators

109.     JPM's retaliation is especially clear in light of the obvious differences between its treatment of Mr. Turnbull and its treatment of precious metals employees who pleaded guilty, were otherwise indicted, or were implicated as alleged co-conspirators in the DOJ indictments.

110.     JPMorgan claims that it terminated Mr. Turnbull for trading in a manner that "could have the appearance of spoofing" because it "potentially exposed" the Bank to regulatory

scrutiny.

111.    JPMorgan did not apply this standard to other precious metals traders.

112.    A New York-based trader was employed by JPMorgan between 2006 and 2009. JPMorgan knew about his trading data and chat transcripts, which underlie the charges against him in the superseding indictment. Nevertheless, JPMorgan employed him even while using an excerpted chat transcript of his in training documents to illustrate dialogue conveying the appearance of manipulative intent. And although he purportedly had two further unrelated conduct violations, JPMorgan did not subject the trader to discipline and released him favorably with severance, a substantial financial award, and other benefits not offered to Mr. Turnbull. He was later indicted by the DOJ.

113.    Another New York-based trader was employed by JPMorgan between approximately 2004 and 2017. Although JPMorgan had long surveilled his trading data and chat transcripts, he was released favorably in 2017. He pleaded guilty to spoofing the following year.

114.    Trader C was employed by JPMorgan between 2008 and 2019. JPMorgan recognized that Trader C's trading practices "could be perceived as spoofing" when it began an internal investigation of his conduct in 2016. JPMorgan—having concluded that his conduct did not meet company standards—issued a verbal warning. But Trader C's conduct so obviously violated JPMorgan's "could be perceived as spoofing" "standard" that the Bank used examples of his order sequences in employee training materials as illustrations of how not to trade— because the conduct looked like spoofing. Nevertheless, JPMorgan retained him in its employ until he resigned three years later to plead guilty to eight years of spoofing, and a related CFTC enforcement action acknowledged that he placed "thousands" of spoof orders.

115.    A precious metals supervisor was employed by JPMorgan between approximately

1996 and 2019. He was indicted in 2019 for thousands of alleged instances of spoofing, yet he remained in JPMorgan's employ until after his indictment was unsealed in September 2019.

116.    Trader B was employed by JPMorgan between 2008 and 2019. His trading record, more than just "potentially expos[ing]" JPMorgan to regulatory scrutiny, attracted multi-year scrutiny from the CME and CFTC. Strategies under investigation from 2013 continued until 2015, and in the intervening period Mr. Turnbull's causes for concern were confidently and reassuringly dismissed by multiple Bank authorities on at least three occasions. Nevertheless, regulatory scrutiny did not end there, and in 2017 it resulted in a suspension for Trader B and a personal fine, which JPMorgan paid on his behalf. In 2019 Trader B was indicted for tens of thousands of sequences of spoofing, yet he remained in JPMorgan's employ without any discipline until after that indictment was unsealed.

117.    A precious metals salesperson was employed by JPMorgan between 2008 and 2017. He was indicted in November 2019 in connection with spoofing by JPMorgan precious metals traders, but he had previously been released favorably from the Bank in 2017.

118.    JPMorgan first trained employees to avoid trading in a manner that might risk even the appearance of spoofing in late 2013. The Bank has not questioned a single order that Mr. Turnbull placed after this training. By contrast, all six indicted individuals engaged in widespread, allegedly manipulative conduct after this training.

119.    But JPMorgan not only did not terminate any of those indicted for "trading in a manner that could be perceived as spoofing." Instead, for years it approved the conduct for continued use, defended it to regulators, and continued to employ these individuals, releasing them favorably from the firm or terminating them only as a result of their indictment.

120.    On information and belief, at the time of Mr. Turnbull's termination, at least four

of the alleged co-conspirators had been released from the firm favorably (including an individual who bragged about spoofing in an electronic chat), and at least one of the alleged co-conspirators remained employed by JPMorgan and had not been interviewed by the Bank about his own trading conduct.

121.    JPMorgan treated Mr. Turnbull worse than each of these alleged "bad actors," none of whom voluntarily cooperated and repeatedly met with the DOJ while under JPMorgan's employ.

122.    JPMorgan fired Mr. Turnbull—who had never been disciplined over the course of his entire career, cooperated fully with the DOJ's investigation, and was neither indicted nor among the alleged co-conspirators in the DOJ indictments—without a proper internal hearing, FMLA benefits, his unvested shares, a severance package, or a substantive explanation.

123.    These choices—far more aggressive than the Bank's favorable treatment of traders indicted or implicated as co-conspirators in the DOJ's investigation—sought to undermine Mr. Turnbull's credibility and threaten his professional reputation.

124.    JPMorgan—which, for years, defended traders with tens of thousands of admittedly or allegedly manipulative trading sequences— "determined," more than six years after the fact, that Mr. Turnbull's exemplary trading practices somehow justified termination. This self-serving firing was pretextual. It was retaliatory. And it was and unlawful under the Sarbanes-Oxley Act.

## CAUSE OF ACTION
### (Unlawful Retaliation Pursuant to Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A)

125.    Mr. Turnbull repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

126.    A publicly traded company like JPMorgan cannot "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee" because the employee:

> Testif[ies], participate[s] in, or otherwise assist[s] in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. §1514A(a)(2).

127.    Mr. Turnbull participated and assisted in the DOJ's investigation of the JPMorgan precious metals desk, which constitutes a proceeding filed relating to an alleged violation of 18 U.S.C. §§ 1343 and 1344(1), as set forth in 18 U.S.C. § 1514A(a)(2).

128.    JPMorgan knew that Mr. Turnbull had participated in the DOJ investigation.

129.    Mr. Turnbull's meetings with DOJ investigators "constitute[] admissible evidence" of his engagement in protected activity. *Yang v. Navigators Grp., Inc.*, 674 F. App'x 13, 14-15 (2d Cir. 2016).

130.    Mr. Turnbull's participation in, and cooperation with, the DOJ's investigation of manipulative trading on JPMorgan's precious metals desk was a contributing factor in the retaliatory actions JPMorgan took against him, and by reason thereof, JPMorgan violated 18 U.S.C. § 1514A.

131.    "A reasonable juror could find that the string of retaliatory acts culminating in [Turnbull's] termination is evidence that [Turnbull's] protected activity was a contributing factor in the adverse employment action." *Mahony v. Keyspan Corp.*, No. 04 Civ. 554, 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007).

24

132.    As a result of JPMorgan's actions, Mr. Turnbull has suffered damages, including but not limited to lost earnings, lost unvested stock, and damages to his reputation that will diminish his future earnings and earning capacity.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

a.    Awarding compensatory damages to make Plaintiff whole, including but not limited to damages to reputation, unvested compensation pursuant to 18 U.S.C. § 1514A(c)(1), back pay pursuant to 18 U.S.C. § 1514A(c)(2)(B), and front pay pursuant to 18 U.S.C. § 1514A(c)(1), in an amount to be determined at trial, together with interest;

b.    Reinstating Plaintiff to his position at JPMorgan as of termination pursuant to 18 U.S.C. § 1514A(c)(2)(A);

c.    Awarding Plaintiff reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1514A(c)(1) and (2)(C); and

d.    For such other and further relief as the Court deems just and proper.

Dated:  April 13, 2021
       New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP

                                        By:  _____
                                             Richard Emery
                                             O. Andrew F. Wilson
                                             Emma L. Freeman
                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiff Donald Turnbull*