UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────

DONALD TURNBULL,
                    Plaintiff,                21-cv-3217 (JGK)

        - against -                           MEMORANDUM OPINION
                                              AND ORDER
JPMORGAN CHASE & CO.,
                    Defendant.

────────────────────────────

JOHN G. KOELTL, District Judge:

        The plaintiff, Donald Turnbull, brought this suit against

his former employer, JPMorgan Chase & Co. ("JPMorgan" or the

"defendant"), alleging that JPMorgan retaliated against him in

violation of the Sarbanes-Oxley Act of 2002, 18 U.S.C.

§ 1514A(a)(2). See Am. Compl., ECF No. 21. The defendants now

move to dismiss the Amended Complaint for failure to state a

claim. ECF No. 26.

                              I.

                              A.

        The following facts are taken from the Amended Complaint,

except as noted. The plaintiff, Donald Turnbull, joined

JPMorgan's precious metals trading desk in 2005. Am. Compl. ¶

16. Mr. Turnbull was an effective and respected member of the

department, and earned several promotions, ultimately coming to

"lead the precious metals rates portfolio." Id. ¶¶ 17-20. [1]

─────────────────────

        [1] Unless otherwise noted, this Opinion omits all alterations,
citations, footnotes, and internal quotation marks in quoted text.

In 2018, the Department of Justice ("DOJ") began investigating the desk for "spoofing." Id. ¶ 22. Spoofing is the illegal practice of placing orders for trades with the intention of canceling those orders before execution, in order to create the illusion of supply or demand, causing prices to shift, and trade on those shifted prices. See id. ¶¶ 23-24, 29-30.

In 2011, the Anti-disruptive Practice Authority of the Dodd-Frank Act became effective. Id. ¶ 32. In response, "regulators and federal prosecutors began to crack down on alleged spoofing activity." Id. In 2013, the CME, the primary exchange on which precious metals futures are traded, began investigating JPMorgan's precious metals desk. Id. One trader was suspended as a result of this investigation. Id.

The DOJ later began investigating similar conduct. Id. The plaintiff "cooperated fully" with the investigation, including by "sp[eaking] with investigators at length during three meetings between March and August 2019, answering every question investigators asked." Id. ¶ 41. In those interviews, the plaintiff told the DOJ in "sum and substance" what he would eventually tell JPMorgan. Id. ¶ 97. In particular, he discussed the trading conduct of "Trader A." Id. ¶ 94. The plaintiff had reported Trader A's trades in the past, but learned that they had been approved by JPMorgan. Id. ¶ 90. Trader A was later investigated by the CME and the Commodity Futures Trading

2

Commission, suspended, fined, and charged with market manipulation. Id. The plaintiff also offered "his interpretation of the electronic chat transcript between Traders D and E," namely, "that the transcript appeared inappropriate to him and may have constituted misconduct." Id. ¶¶ 93-94.

The plaintiff alleges that JPMorgan was aware of the investigation, id. ¶ 43, and that it "knew that Mr. Turnbull had met with the DOJ on all three occasions," and that these meetings "were related to the[] ongoing investigations." Id. ¶¶ 42, 45. The plaintiff does not specifically allege when JPMorgan became aware of the DOJ investigation. The plaintiff also alleges that JPMorgan "knew that the DOJ's interviews of Mr. Turnbull included questions about JPMorgan's compliance program and the culture and trading practices on its precious metals desk." Id. ¶ 46.

On August 20, 2019, a JPMorgan precious metals trader pleaded guilty to participating in a spoofing conspiracy. The Court takes judicial notice of the guilty plea as a public record. See, e.g., Wims v. New York City Police Dep't, No. 10-cv-6128, 2011 WL 2946369, at *3 n.2 (S.D.N.Y. July 20, 2011). In September 2019, the DOJ unsealed an indictment against three traders on JPMorgan's precious metals desk on spoofing-related charges. The Court takes judicial notice of the August 22, 2019 indictment (the "Smith Indictment") and other filings made in

3

United States v. Smith, No. 19-cr-669 (N.D. Ill. filed Aug. 22, 2019), as public records. See, e.g., Blount v. Moccia, No. 16-cv-4505, 2017 WL 5634680, at *2 n.5 (S.D.N.Y. Nov. 21, 2017). The Court takes judicial notice of these records not for the truth of the allegations therein, but for the existence of the documents, the existence of the allegations, and, in the case of the Smith Indictment, the fact of its unsealing in September 2019. Deaton v. Napoli, No. 17-cv-4592, 2019 WL 4736722, at *7 n.5 (E.D.N.Y. Sept. 27, 2019) ("The Court views these documents solely to observe the existence of the allegations made therein, not for the truth of the matters asserted.").

The Smith Indictment also names eight unindicted co-conspirators. Underlying these charges were over 50,000 trading sequences, each potentially containing multiple orders. Id. ¶ 36. The indictment also alleged certain frauds by these traders. Id. ¶ 39. The plaintiff denies ever engaging in any illegal practices. Id. ¶ 40.

"JPMorgan asked that Mr. Turnbull sit for an interview on Monday October 7, 2019." Id. ¶ 53. JPMorgan had "'flagged' a number of innocuous trading sequences for review at this meeting," but "most of the discussion involved Mr. Turnbull's knowledge of and opinions about his colleagues and the Bank's control mechanisms. In response to these inquiries, Mr. Turnbull highlighted severe, chronic institutional failures at JPMorgan,"

id. ¶ 55, including a failure to train employees on spoofing until late 2013, and JPMorgan's two-time approval of Trader A's conduct." Id. ¶ 90. The plaintiff was asked whether he believed that Trader D "had manipulated barrier options," to which the plaintiff responded that he had seen the transcript of that trader's electronic chat with Trader E in a DOJ interview, "and that the transcript appeared inappropriate to him and may have constituted misconduct." Id. ¶¶ 91-93. The plaintiff also explained that he thought current mechanisms for monitoring possible market manipulation were inadequate, but was told that his proposed improvements were too complex. Id. ¶ 90. The meeting, which was scheduled to last 2.5 hours, lasted almost 5 hours. Id. ¶ 56.

The plaintiff alleges that JPMorgan, "[f]earing that Mr. Turnbull would repeat the contents of these internal interviews to the DOJ — and out of concern for what he had already told investigators," took certain retaliatory acts against Mr. Turnbull. Id. ¶ 57. In particular, the plaintiff alleges that, on October 18, 2019, "JPMorgan told Mr. Turnbull that the Bank wanted to discuss additional trading sequences" with Mr. Turnbull. Id. ¶ 57. The meeting was to take place on October 24, 2019. On October 21, 2019, JPMorgan informed Mr. Turnbull that the meeting would consist of Mr. Turnbull's "walk[ing] through" the flagged sequences. Id. ¶ 58. On October 23, 2019, "JPMorgan

flagged an additional subset of order sequences for discussion."
Id. ¶ 60.

The meeting lasted 7 hours, rather than the scheduled 3.
Id. ¶ 61. During the meeting, JPMorgan invoked certain data that
the company had not provided to Mr. Turnbull before the meeting.
Id. The plaintiff alleges that the data invoked "could not
support inferences of misconduct," and that it was "flawed and
internally inconsistent," and "incorporated trades completed by
individuals who had been indicted or alleged as co-conspirators
and whose conduct had nothing to do with Mr. Turnbull's." Id. ¶¶
62-63. JPMorgan's investigators "brushed aside" this conflation.
Id. ¶ 63.

The meeting resumed the following day for an additional
hour. Id. ¶ 64. The plaintiff alleges that "JPMorgan believed
that Mr. Turnbull had already disclosed to the DOJ the sum and
substance of what he shared with JPMorgan" during these
interviews. On October 29, 2019, "Mr. Turnbull supplemented the
record with an affirmative defense of his trading conduct." Id.
¶ 66.

On October 31, 2019, JPMorgan informed Mr. Turnbull that he
was being placed on leave. On November 3, 2019, Mr. Turnbull saw
an email from his supervisor, indicating that there would be a
call "to brief the participants on [the plaintiff's] departure
from the Firm," and inform them that another employee would be

taking on his role. Id. ¶ 69. JPMorgan had not yet informed Mr. Turnbull of this. Id. ¶ 70.

Thereafter, "[d]espite knowing that Mr. Turnbull's wife suffered from severe health issues, JPMorgan did not notify Mr. Turnbull of his FMLA eligibility of entitlements." Id. ¶ 72. JPMorgan also did not award the plaintiff his unvested shares, incentive compensation, or a severance package, cut off his salary without notice, and did not provide any written notice of the reason for the plaintiff's termination. Id. ¶¶ 73-78. JPMorgan also threatened to claw back certain portions of the plaintiff's compensation. Id. ¶ 78.

The plaintiff concedes that the "claimed" reason for his termination was that "certain of the flagged trading sequences did not meet the Bank's expectations," but alleges that JPMorgan did not "identify which sequences failed to meet expectations until almost nine months after his termination," ultimately identifying 14 sequences that "could be perceived of spoofing" out of a possible 53,000. Id. ¶¶ 79-80. The plaintiff alleges that JPMorgan's knowledge of his "participation in the DOJ investigation and his disclosure to the DOJ of information about JPMorgan's serious institutional failures to provide guidance, surveillance, and enforcement on trading conduct" was "at least a contributing factor" in his termination. Id. ¶¶ 84-85. He also alleges that JPMorgan terminated him to "diminish his

7

credibility," in case he were to disclose further negative information to the DOJ, and to "retaliate against him for cooperating with the DOJ." Id. ¶¶ 88–89.

In September 2020, the DOJ and JPMorgan entered into a Deferred Prosecution Agreement (the "DPA"). The DPA alleges that "Trader 3," who joined JPMorgan in 2005, worked in New York and London, left the company in October 2019 and was the Global Head of Precious Metals Trading at the time of his departure, DPA ¶ 15, was aware of spoofing activities and "engaged in unlawful trading activity." Id. ¶ 43. The description plainly describes the plaintiff. The Court takes judicial notice of the Deferred Prosecution Agreement ("DPA") as a public record. See Villella v. Chem. & Mining Co. of Chile Inc., No. 15-cv-2106, 2017 WL 1169629, at *1 n.2 (S.D.N.Y. Mar. 28, 2017). The Court takes judicial notice of the DPA not for the truth of the allegations therein, but for the existence of the document and of the allegations therein. Deaton, 2019 WL 4736722, at *7.

In July 2021, DOJ filed motions in limine in Smith. See Smith, 19-cr-669, ECF No. 294 (N.D. Ill. filed July 9, 2021). One of those motions mentions the plaintiff by name in connection with spoofing-related misconduct. See id.

**B.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all

8

reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, it need not accept as true legal conclusions contained in the complaint. Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers, 282 F.3d at 153.

## II.

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, and because the plaintiff has timely exhausted his administrative remedies thereunder as required by Daly v. Citigroup Inc., 939 F.3d 415, 427-28 (2d Cir. 2019), cert. denied, 140 S. Ct. 1117 (2020). See ECF No. 36.

## III.

### A.

The plaintiff brings a claim under 18 U.S.C. § 1514A(a)(2). Am. Compl. ¶ 146. Section 1514A(a) provides that a covered company and its employees may not:

> [D]ischarge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee —
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation [into certain forms of illegal conduct] . . . ; or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to [certain forms of illegal conduct].

To prevail on a whistleblower claim under § 1514A(a), a plaintiff must show that "(i) [the plaintiff] engaged in a protected activity, (ii) the employer knew that [the plaintiff] engaged in the protected activity; (iii) [the plaintiff] suffered an unfavorable personnel action; and (iv) the protected

10

activity was a contributing factor in the unfavorable action."
Nielsen v. AECOM Tech Corp., 762 F.3d 214, 219 (2d Cir. 2014).
The defendant does not dispute that the defendant is a company
to which the statute applies. The defendant also appears to
assume, at least for the purpose of the motion to dismiss, that
the plaintiff engaged in protected activity, and that the
plaintiff's termination was an unfavorable personnel action. The
defendant thus only disputes that it knew that the plaintiff
engaged in the protected activity, and that the protected
activity was a contributing factor in the plaintiff's
termination.

### B.

The plaintiff attempts to argue that causation is not a
necessary element of a claim under § 1514A(a)(2), as distinct
from § 1514A(a)(1). That argument is entirely without merit. The
plaintiff offers no textual difference between subsections (1)
and (2) of the statute that would suggest that causation would
be required under one but not the other. The formulation of
§ 1514A(a) that unfavorable personnel action is unlawful if done
"because of" conduct protected by subsections (1) and (2)
applies to both of those subsections. The only difference
between the two is the type of conduct each section covers.
Accordingly, there is no basis to conclude that pleading
causation is required by one but not the other. Courts agree

that causation is required for a violation of subsection (2).

See, e.g., Trusz v. UBS Realty, No. 3:09-cv-268, 2016 WL
1559563, at *7 (D. Conn. Apr. 18, 2016); Romaneck v. Deutsche
Asset Mgmt., No. C05-2473, 2006 WL 2385237, at *6 (N.D. Cal.
Aug. 17, 2006). Indeed, causation is an integral aspect of a
claim for retaliation.

### c.

The plaintiff argues that the fact that he was terminated
shortly after the defendant interviewed him permits a plausible
inference that JPMorgan terminated him because he
"participat[ed] . . . or otherwise assisted[] in a proceeding
. . . relating to unlawful activity." But the plaintiff has
alleged no facts that would support an inference that his
participation in the DOJ investigation was a contributing factor
in his termination. Quite the contrary. The only plausible
inference is that it would have been counter-productive for
JPMorgan to terminate the plaintiff for cooperating in the DOJ
investigation when JPMorgan itself was ostensibly cooperating
with the DOJ and eventually entered into a DPA with the
Government. In this case, there are no allegations of any
suspicious or incriminating comments by any JPMorgan personnel
or any alleged false or contradictory explanations by JPMorgan
personnel. The only fact alleged in support of an inference of
retaliation is the timing of the events at issue. The plaintiff

alleges that he was terminated in November after having been interviewed by the DOJ starting in March and ending in August. He alleges that JPMorgan knew that he was having conversations with the DOJ and that those conversations started in March, although he offers no factual allegations as to when JPMorgan became aware of this cooperation with the DOJ. In the absence of other facts supporting an inference of retaliation, the temporal proximity between the protected conduct and the adverse action must be "very close" to permit an inference of retaliation. See, e.g., Sealy v. State Univ. of N.Y. at Stony Brook, 834 F. App'x 611, 614 (2d Cir. 2020). While the Court of Appeals has never laid down a bright line with respect to the time that must pass to defeat temporal proximity, see Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001), it has found periods of as short as three months to defeat an inference of causation. See, e.g., Sealy, 834 F. App'x at 614.

The Court of Appeals for the Second Circuit has, in contexts other than Sarbanes-Oxley, used as a starting point the initiation of the protected conduct. See Dotson v. City of Syracuse, 688 F. App'x 69, 73 (2d Cir. 2017). In this case, given the plaintiff's failure to allege exactly when JPMorgan became aware of the plaintiff's protected conduct, the relevant starting point is the plaintiff's March communications with the

DOJ. Between that time and the plaintiff's termination, almost eight months passed. That is too long a delay to permit an inference of retaliation. See, e.g., McDowell v. N. Shore-Long Island Jewish Health Sys., Inc., 788 F. Supp. 2d 78, 83 (E.D.N.Y. 2011) (dismissing a retaliation claim where the alleged adverse action occurred three months after the alleged protected activity); Pardy v. Gray, No. 07-cv-6324, 2008 WL 2756331, at *6 (S.D.N.Y. July 15, 2008) (granting summary judgment in favor of the defendants where the only evidence the plaintiff had adduced in support of an inference of retaliation was a six-month gap); Fraser v. Fid. Tr. Co., Int'l, 04-cv-6958, 2005 WL 6328596, at *10 (S.D.N.Y. June 23, 2005) (dismissing a retaliation claim under Sarbanes-Oxley where the alleged adverse action occurred ten months after the alleged protected activity).

Moreover, in light of all the circumstances that the plaintiff pleads, the inference of retaliation is not plausible. See Alexander v. Bd. of Educ. of City of N.Y., 648 F. App'x 118, 120-21 (2d Cir. 2016) (considering an alternative explanation for the plaintiff's termination in determining whether claims of retaliatory intent were plausible).

JPMorgan was undergoing intense scrutiny by the DOJ in 2019, and as the plaintiff alleges, it was aware of that scrutiny. This awareness makes it implausible that the defendant

14

would have terminated an employee for cooperating with the DOJ
when JPMorgan was also attempting to cooperate. Firing a
cooperating employee because the employee was also cooperating
would be extremely counterproductive. Rather, the plaintiff's
own allegations make it clear that JPMorgan examined the
plaintiff's own activities and found them questionable and those
activities formed part of JPMorgan's DPA. There is no plausible
allegation that it was the plaintiff's cooperation with the
Government that was a contributing factor in his termination.
All of the plaintiff's allegations as to JPMorgan's motivation
for his termination are completely conclusory and implausible.

In deciding a motion to dismiss, the Court is not obligated
to suspend its common sense. AJ Energy LLC v. Woori Bank, 829 F.
App'x 533, 534 (2d Cir. 2020). The complaint in this case does
not allege enough facts to allow the Court to draw the
implausible inference that retaliation was a contributing factor
in the plaintiff's termination.[2]

## Conclusion

The Court has considered all of the arguments of the
parties. To the extent not specifically addressed above, those
arguments are either moot or without merit. For the foregoing

---

[2] It is unnecessary to reach the defendant's argument that it
would have terminated the plaintiff even in the absence of his
alleged protected activity. See Bechtel v. Admin. Rev. Bd., U.S.
Dep't of Lab., 710 F.3d 443, 447 (2d Cir. 2013).

reasons, the defendant's motion to dismiss is **granted** without prejudice to the plaintiff's ability to file an amended complaint. The plaintiff may file a second amended complaint within 30 days of the date of this Order. All sealed filings will remain under seal unless there is a subsequent motion to unseal specific filings. The Clerk is directed to close all pending motions.[3]

**SO ORDERED.**
**Dated:**      New York, New York
               February 24, 2022

John G. Koeltl
United States District Judge

---

[3] The defendant's request for oral argument is denied. This is not a case that would benefit from argument.