UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD TURNBULL,

                    Plaintiff,

   -against-

JPMORGAN CHASE & CO.,

                  Defendant.

Index No. 1:21-cv-03217-JGK

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ...................................................................................1

THE PARTIES....................................................................................................4

JURISDICTION ..................................................................................................5

JURY DEMAND ..................................................................................................5

FACTUAL ALLEGATIONS .......................................................................................5

    I.      Donald Turnbull.............................................................................5

    II.     The DOJ Investigates Spoofing at JPMorgan's Precious Metals Desk ...................7

          A.      Futures Trading of Precious Metals and the Practice of Spoofing ..............7

          B.      The DOJ Indicts Six JPMorgan Employees for Spoofing ..........................8

          C.      Mr. Turnbull Cooperates Fully in the DOJ's Investigation of
                 JPMorgan ..............................................................................10

    III.    JPMorgan Learns the Harmful Content of Mr. Turnbull's Protected Activity
          During the October 7, 2019 Interview ..................................................13

    IV.    Having Learned the Substance of His Damning Disclosures to the DOJ,
          JPMorgan Terminates Mr. Turnbull In Retaliation for His Protected Activity .....17

          A.      The October 7 Interview Changes JPMorgan's View of Mr. Turnbull .....17

          B.      JPMorgan's Initial Adverse and Retaliatory Employment Actions...........19

          C.      JPMorgan Provides False Evidence to the DOJ to Further Retaliate
                 Against Mr. Turnbull  ...............................................................23

    V.     Mr. Turnbull's Protected Activity Was a Contributing Factor to His
          Termination from JPMorgan.............................................................27

          A.      JPMorgan's Purported Reason for Terminating Mr. Turnbull Was
                 Pretextual ..............................................................................28

                 i.      Number of flagged sequences relative to Mr. Turnbull's order
                        history ...........................................................................30

ii.     Value of the flagged sequences relative to Mr. Turnbull's P&L..................................................................................................31

iii.    Speed with which the flagged orders were cancelled ...................32

VI.    JPMorgan Treated Mr. Turnbull More Severely Than Individuals Indicted or Implicated as Co-Conspirators..............................................................32

CAUSE OF ACTION .............................................................................................36

Plaintiff Donald Turnbull, by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for his Second Amended Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      JPMorgan (hereafter "JPMorgan" or "Bank") fired Donald Turnbull from his job as a commodities trader because the Bank learned on October 7, 2019 that Mr. Turnbull, in interviews with federal investigators, had provided information damaging to JPMorgan's efforts to avoid prosecution for a range of the Bank's institutional failures regarding manipulative trading practices over several years.

2.       Immediately after the Bank learned that Mr. Turnbull had provided damaging information about these failures to the Department of Justice ("DOJ") and would likely continue to do so, JPMorgan subjected Mr. Turnbull to a pretextual internal investigation, the outcome of which was preordained. This rushed "investigation" denied Mr. Turnbull any meaningful opportunity to defend himself, all in order to reach its foregone conclusion: termination. The Bank's purpose was to discredit Mr. Turnbull by falsely accusing him of trading activity that would undermine his credibility and cast doubt on information that, on October 7, 2019, the Bank learned Mr. Turnbull had provided to the DOJ. To accomplish this, the Bank abruptly placed Mr. Turnbull on leave on October 31, 2019—just twenty-four days after it learned the substance of the damaging information Mr. Turnbull had provided to DOJ investigators. The Bank then immediately and secretly terminated Mr. Turnbull.

3.      JPMorgan is liable under Section 806 of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514(A), for its retaliatory adverse actions against Mr. Turnbull and the severe damage the Bank has caused him.

4.      Until the Bank decided to terminate him, in October 2019, Mr. Turnbull had been

a prized employee of JPMorgan for nearly fifteen years. During his time there, Mr. Turnbull quickly rose through the ranks of the Bank's precious metals group, and in April 2018 had reached the prestigious title of "Managing Director" in Precious Metals Trading. Throughout his tenure, JPMorgan gave Mr. Turnbull increasing responsibility and continually lauded his exceptional business judgment, trading acumen, and professional integrity. Mr. Turnbull's trading leadership yielded hundreds of millions of dollars of profit, all of which was legitimate, for the Bank.

5.      By October 2018, the DOJ was investigating unlawful trading practices, including "spoofing," on JPMorgan's precious metals desk. In the context of commodities trading on the futures market, "spoofing" entails placing a futures contract order with the intent to cancel that order before execution. Designed to manipulate the market by creating false impressions of increased supply or demand, spoofing allows traders to deceive other market participants.

6.      When the DOJ asked Mr. Turnbull for a confidential interview in 2019, he agreed. In response to DOJ prosecutors' questioning during three interviews between March and August, Mr. Turnbull provided the DOJ with information that revealed significant, multi-year lapses in JPMorgan's trading oversight mechanisms and enforcement judgments. The information Mr. Turnbull provided to the DOJ was truthful. It exposed specific instances of the Bank failing to address market manipulation and illegal conduct, including profiting from the allegedly illegal trading activities of persons Mr. Turnbull had reported to Bank supervisors who, subsequently, told Mr. Turnbull that the Bank had endorsed the reported activity.

7.      When he first began cooperating with the DOJ, JPMorgan was not aware of what Mr. Turnbull was telling government investigators. At that time, JPMorgan appeared to view Mr. Turnbull as a loyal precious metals employee who would hew to the Bank's defense in the

course of the Bank's efforts to negotiate its way out of criminal liability with the DOJ.

8.      But, on October 7, 2019, everything changed.

9.      That day, for the first time, during an extensive interview with the Bank,

Mr. Turnbull shared with JPMorgan substantially all of the same, specific information Mr.

Turnbull had provided to the DOJ.

10.      On October 7, 2019, and thereafter, as far as JPMorgan was concerned,

Mr. Turnbull was no longer providing information to the DOJ consistent with the Bank's defense

in the DOJ investigation. Instead, Mr. Turnbull became a key threat to the Bank's reputation and

to its fate at the hands of government prosecutors. At that point, it was in the Bank's interest to

undermine Mr. Turnbull's credibility and overall integrity. It did so by falsely accusing him of

improper trading activity.

11.      Mr. Turnbull never spoofed or engaged in any illegal trading activity of any sort

during his entire career. Mr. Turnbull's trading record does not—contrary to the Bank's

assertions—"appear" to contain instances of spoofing to any objective observer.

12.      Almost immediately after the October 7 interview, JPMorgan launched a

retaliatory campaign against Mr. Turnbull. Alarmed by Mr. Turnbull's reports to the DOJ of its

institutional culpability, JPMorgan hurried through a faux inquiry into Mr. Turnbull's

unimpeachable trading practices. Based on a pretextual narrative that the Bank had lost

confidence in him, the Bank terminated Mr. Turnbull three and a half weeks after the October 7

interview, cancelled his unvested stock, and threatened to claw back his prior compensation.

13.      Mr. Turnbull never engaged in spoofing, and JPMorgan had never asked to

consult with Mr. Turnbull about his own trading conduct prior to 2019.

14.      The Bank's conduct toward Mr. Turnbull stands in stark contrast to its lenient

treatment of employees indicted for market misconduct.

15.     In August 2019, the DOJ charged four JPMorgan precious metals traders, alleging spoofing and other market misconduct based on tens of thousands of trading sequences between 2008 and 2016.

16.     JPMorgan treated the six individuals ultimately indicted far more favorably than it treated Mr. Turnbull, whose trading practices bear no relationship to these individuals' admitted and alleged conduct. JPMorgan released three indicted individuals favorably from employment, one resigned on the day he pleaded guilty to charges of conspiracy and spoofing, and JPMorgan terminated the remaining two only after their indictments were unsealed.

17.     JPMorgan's sharply disparate treatment of Mr. Turnbull and these other JPMorgan employees makes the Bank's retaliation against Mr. Turnbull crystal clear. The Bank's pretextual, *post hoc* basis for terminating Mr. Turnbull was and is false. Mr. Turnbull's termination was unlawful.

### THE PARTIES

18.     Plaintiff Donald Turnbull is a graduate of Yale University with a Bachelor of Arts degree in Economics and International Studies. Mr. Turnbull joined JPMorgan as an analyst in 2005 and was made a Managing Director within JPMorgan's Precious Metals Trading practice in April 2018.

19.     Defendant JPMorgan Chase & Co. is an American multinational investment bank and financial services holding company headquartered in New York City at 383 Madison Avenue, New York, New York 10017. JPMorgan is traded on the NASDAQ and the New York Stock Exchange. With assets exceeding $3.7 trillion, JPMorgan is the largest bank in the United States and the fifth largest bank in the world. Among other things, JPMorgan operates a global

commodities trading business that trades precious metals futures contracts and options. JPMorgan is a financial institution pursuant to 18 U.S.C. § 20.

## JURISDICTION

20.     Mr. Turnbull filed a Complaint with the Occupational Safety and Health Administration ("OSHA") on April 28, 2020 ("OSHA Complaint") that was timely with respect to the alleged adverse employment actions that occurred or Plaintiff became aware of on or after October 31, 2019 (180 days prior to April 28, 2020). Joint Stipulation and Order (Dkt. Nos. 36-1 & 37).

21.     The First Amended Complaint satisfies the administrative exhaustion requirement under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, as to the alleged adverse employment actions that occurred or Plaintiff became aware of on or after October 31, 2019. Joint Stipulation and Order (Dkt. Nos. 36-1 & 37).

22.     This Court has subject matter jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 because this action arises under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A.

23.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims occurred in this judicial district.

## JURY DEMAND

24.     Plaintiff demands trial by jury in this action.

## FACTUAL ALLEGATIONS

**I.     Donald Turnbull**

25.     Mr. Turnbull graduated from Yale University, *cum laude*, in three-and-a-half years, earning distinction in both of his majors.

26.     After graduation, Mr. Turnbull joined JPMorgan as an analyst in 2005 and

fulfilled various roles on the Bank's precious metals desk for nearly 15 years. He was

enthusiastic about his work and loved his job.

27.     Around 2014, JPMorgan leadership asked Mr. Turnbull to represent JPMorgan on

the Management Committee of the London Platinum and Palladium Market trading association

and to represent Precious Metals on a JPMorgan "culture carrier" committee (both of which he

did)—acknowledgments of Mr. Turnbull's professionalism and integrity.

28.     Mr. Turnbull's consistent outperformance as the platinum group metals trader led

to his promotion in role in 2014 to lead the precious metals rates portfolio, a position from which

he led four consecutive record years of financial performance from 2015 onwards.

29.     Throughout his tenure at JPMorgan, Mr. Turnbull received eight promotions,

including moving from desk junior, to lead platinum group metals trader, to lead precious metals

rates trader, and from trader to local desk head before his 2017 appointment as Global Head of

Precious Metals Trading. His promotions culminated in his 2018 promotion to Managing

Director.

30.     Mr. Turnbull's yearly performance reviews further reflected his excellence. He

was regarded as best in his class, with high attention to detail and sound judgment for identifying

and escalating control issues appropriately. In 2018, Mr. Turnbull was deemed "one of [the]

most diligent and controlled traders," who is "exceptional at both managing risk and

communicating a balanced view of these risks to senior management."

31.     In short, JPMorgan considered Mr. Turnbull a "culture carrier"—an employee

who maintained high standards of integrity and embodied the values to which the Bank

purportedly aspired.

6

**II.      The DOJ Investigates Spoofing at JPMorgan's Precious Metals Desk**

32.      By October 2018, the DOJ had begun to investigate the JPMorgan precious metals desk for allegedly engaging in an illegal trading practice known as "spoofing."

33.      JPMorgan became aware of this investigation by the DOJ no later than November 6, 2018, when a former JPMorgan precious metals trader's guilty plea for spoofing was unsealed.

34.      In the context of commodities trading, spoofing refers to a trader's placement of an order to buy or sell futures contracts with the intent to cancel that order before it is executed.

35.      Spoofing is designed to manipulate the market and yield favorable prices for the spoofing trader, his employer, and/or his clients.

**A.   Futures Trading of Precious Metals and the Practice of Spoofing**

36.      The trading of precious metals—including gold, silver, platinum, and palladium, all naturally occurring high-value metals—frequently involves the purchase and sale of "futures contracts." A "futures contract" is a standardized financial agreement to buy or sell a particular precious metal at a fixed price, to be (i) delivered and (ii) paid for at a specific date in the future.

37.      Futures contracts protect against—and profit from—fluctuating prices in the commodities market by insulating buyers and sellers from shifts in supply and demand. Producers and consumers of commodities use futures contracts to stabilize revenues or costs. Financial institutions, investment banks, and individual traders use futures contracts to hedge client business and generate trading profits. JPMorgan is one such market participant.

38.      Futures contracts are traded only on certain designated and regulated exchanges, all governed in the United States by the Commodity Futures Trading Commission ("CFTC"). As a result, futures contracts are highly standardized.

39.     According to the DOJ, since the advent of financial markets, some traders have attempted to manipulate them. One mechanism for market manipulation is known as spoofing, which the Wall Street Reform and Consumer Protection Act, commonly known as the Dodd-Frank Act, defined as "the illegal practice of bidding or offering with intent to cancel before execution." 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2).

40.     According to the DOJ, by placing large orders with no intent to execute them, spoofers create an illusion of increased demand or supply for a particular commodity. This illusion may, in turn, cause prices to change as the market responds to the perceived one-sided shift. A large order to buy—or an appearance of greater demand—may increase prices. A large order to sell—or an appearance of greater supply—may, in turn, decrease them.

41.     According to the DOJ, typically, a spoofer will place a genuine order on one side of the market, and multiple and/or larger deceptive orders on the other. After the market responds to the deceptive orders and the genuine order is filled, the spoofer will rapidly withdraw the deceptive orders before execution. The trader who spoofs therefore benefits from market manipulation by leveraging deceptive orders to yield a better fill price on genuine orders.

**B.  The DOJ Indicts Six JPMorgan Employees for Spoofing**

42.     The Anti-Disruptive Practices Authority of the Dodd-Frank Act became effective on July 16, 2011. From that time forward, regulators and federal prosecutors began to crack down on alleged spoofing activity. In conjunction with that effort, over several years beginning in 2013, the CME (the primary exchange on which the JPMorgan precious metals team traded futures) investigated certain individuals on JPMorgan's precious metals desk for potential spoofing conduct, which resulted in fines and/or the suspension of more than one trader.

43.     Later, the DOJ began investigating the same and similar conduct.

8

44.     On November 14, 2019, attorneys in the Criminal Division of the DOJ filed a superseding indictment against four JPMorgan employees as well as seven unindicted co-conspirators in the Northern District of Illinois, Eastern Division.

45.     According to the DOJ's indictments, 13 employees of JPMorgan's precious metals desk are alleged to have engaged in market manipulation between 2008 and 2016. Two pleaded guilty to spoofing-related charges. Four are defendants in a federal indictment. Seven are unindicted co-conspirators in that indictment.

46.     Mr. Turnbull was neither indicted nor among the alleged co-conspirators in the original August 2019 indictment, which was issued after Mr. Turnbull's three interviews with government investigators.

47.     Mr. Turnbull was neither indicted nor among the alleged co-conspirators in the superseding November 2019 indictment, which was issued after JPMorgan's retaliatory termination of Mr. Turnbull.

48.     Broadly, the superseding indictment alleges a racketeering conspiracy between the defendants and their co-conspirators pursuant to 18 U.S.C. §§ 1961(1) and 1961(5), consisting of conduct which violates 18 U.S.C. § 1343 (wire fraud affecting a financial institution) and 18 U.S.C. § 1344(1) (bank fraud).

49.     According to the superseding indictment, the "unlawful trading practices" at issue constitute spoofing: *i.e.*, "plac[ing] orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution, including in an attempt to artificially affect prices and to profit by deceiving other market participants."

50.     The DOJ alleged that 54,456 trading sequences—each of which may contain multiple orders and still more individual contracts, or "lots"—"underlie the charges" in the

9

superseding indictment. In other words, the defendants and their co-conspirators are alleged to have engaged in spoofing in more than fifty-four thousand trading sequences over the course of eight years.

51.     Two of these defendants are separately alleged to have "placed *thousands* of Spoof Orders or Layered Spoof Orders" between 2008 and 2015.

52.     According to the indictment, the defendants and their co-conspirators allegedly used various "spoofing" techniques to inject false and misleading information about supply and demand into the precious metals market for the purpose of deceiving market participants and manipulating prices to benefit their clients, their employer, and themselves.

53.     According to the indictment, the defendants and their co-conspirators also allegedly defrauded clients of JPMorgan by engaging in practices known as "barrier running" and "barrier defending." A "barrier option" is a type of option contract with a value dependent on whether the underlying asset reaches or exceeds a predetermined price during the option's lifetime. "Barrier running" entails manipulating the asset's market price *toward* a price point to trigger a barrier option. "Barrier defending" entails, conversely, manipulating the asset's market price *away from* a price point to avoid triggering a barrier option. The indictment alleges that the defendants and their co-conspirators engaged in these illegal practices in order to yield profits for JPMorgan.

**C. Mr. Turnbull Cooperates Fully in the DOJ's Investigation of JPMorgan**

54.     Since the DOJ began its far-reaching investigation of JPMorgan, Mr. Turnbull has cooperated fully. He spoke with investigators at length during three meetings between March and August 2019, truthfully answering every question investigators asked.

55.     Over the course of his interviews, Mr. Turnbull recalls telling the DOJ, *inter alia*,

the following information about JPMorgan:

    a.  JPMorgan began training commodities employees on what trading behavior constituted spoofing in late 2013, more than three years after Congress moved to outlaw the practice;

    b.  following the news of an investigation of a London-based trader (Trader A[1]) for spoofing in early 2014, Mr. Turnbull raised concerns about the potential spoofing of a New York employee (Trader B) to his manager based on Trader B's reputation for rapid order entry and cancellation while on both sides of the market;

    c.  Mr. Turnbull's manager then told Mr. Turnbull that the Bank had already thoroughly investigated Trader B's conduct; in addition, Mr. Turnbull's manager affirmed that not only was Trader B's conduct completely different from that of Trader A, but also that the Bank was satisfied for Trader B to continue trading in the same manner;

    d.  during or shortly following the internal investigation of Trader A in mid-2014, Mr. Turnbull received information from a senior employee regarding that investigation; in light of specific information about Trader A's suspected trading misconduct relayed to him by the senior employee, which Mr. Turnbull recounted, Mr. Turnbull believed Trader A's conduct was improper, and thus he reasonably believed that Trader A's conduct may have violated securities laws and/or regulations;

    e.  Mr. Turnbull had later learned that the CME or CFTC was investigating Trader B for suspected spoofing;

    f.  Mr. Turnbull had concerns about his anticipated promotion to supervise Trader B because of all the scrutiny of Trader B's trading conduct, but he became comfortable with the idea when his manager assured him not to worry and that the Bank itself was comfortable with Trader B's practices;

    g.  Mr. Turnbull did not believe JPMorgan told Trader B to discontinue his trading practices that came under regulatory scrutiny because the Bank had determined they were improper or illegal. Instead, Mr. Turnbull told the DOJ that he believed JPMorgan may have told Trader B to discontinue these trading practices because the benefits of the strategy were just not worth the scrutiny; and

    h.  with regard to the Bank's investigation of another trader (Trader C) for potential spoofing in or around 2016, his manager told him it was all being handled

---

[1] Plaintiff refers to certain former JPMorgan traders, whose identities Mr. Turnbull provided to the Bank, as Traders A, B, C, D, and E throughout this Complaint.

11

properly, which Mr. Turnbull understood to mean the Bank would take any appropriate actions necessary; Mr. Turnbull knew that the Bank had disciplined Trader C as a result of its investigation.

56.     The DOJ showed Mr. Turnbull a chat transcript between Trader D and a then-current employee unaffiliated with metals trading, Trader E, regarding defending a barrier, and asked Mr. Turnbull for his interpretation of the dialogue in that transcript. Mr. Turnbull told the DOJ that that dialogue about barrier defense appeared inappropriate, and thus Mr. Turnbull reasonably believed that that conduct may have violated securities laws and/or regulations.

57.     In addition, when shown an example of compliance training that was intended to offer an example of how not to trade—because such methods looked like spoofing—Mr. Turnbull recalls telling the DOJ the behavior was a terrible way to manage orders if the trader was actually seeking to get those orders filled. These order sequences were, in fact, the actual conduct of Trader C, who had been minimally disciplined by JPMorgan and subsequently pleaded guilty to spoofing.

58.     During his interviews with the DOJ, Mr. Turnbull was shown various instances of trading conduct with multiple short-lived opposed orders by Traders B and C, two traders whose potential spoofing misconduct was known to the Bank since at least 2013 and 2016 respectively, whose conduct had been fully investigated by the Bank over a multi-year period prior to the DOJ's investigation, and both of whom retained their jobs with minimal discipline for years following those investigations. Mr. Turnbull was also shown certain trading conduct of a precious metals supervisor. Mr. Turnbull had not seen this sort of data before, and because of the bank's prior investigations and regular surveillance of trading conduct, Mr. Turnbull believed the Bank's assurances for years that spoofing was not a practice these traders engaged in. On this topic, Mr. Turnbull recalls telling the DOJ the following:

    a.  Some of the order placements and cancellations occurred too fast for a trader to have had time to think, and that some of the trading data looked like it could be spoofing. Mr. Turnbull further told the DOJ that, in his view, legitimate trading strategies should have very few orders cancelled in under one second;

    b.  Mr. Turnbull was shocked by how high maintenance the trading strategies of the precious metals' supervisor appeared to be while getting a fill for a small quantity of futures contracts, given the material risks he was otherwise managing; and

    c.  in reference to the various trading examples he had been shown in that interview, Mr. Turnbull told the DOJ that JPMorgan Compliance "was aware of all of this."

59. Mr. Turnbull further recalls sharing with the DOJ that:

    a.  A precious metals supervisor was very upset upon learning of the first guilty plea by a JPMorgan precious metals trader in 2018 and called the trader "an idiot";

    b.  Mr. Turnbull had briefly discussed with a compliance officer the FBI's attempts to approach three then-current precious metals traders for interviews, and that in that conversation, the compliance officer had used the term "idiots" in reference to the investigators;

    c.  An individual senior to Mr. Turnbull's manager, in the presence of Mr. Turnbull, had informed Mr. Turnbull's manager, who was a subject of the DOJ's investigation, of Mr. Turnbull's upcoming meeting with the DOJ; and

    d.  the Front Office Supervisory Report ("FOS Report"), a recent mechanism that purportedly monitored for potential market manipulation, was lacking in Mr. Turnbull's view and it did not monitor for potential spoofing.

## III.    JPMorgan Learns the Harmful Content of Mr. Turnbull's Protected Activity During the October 7, 2019 Interview

    60.    As of August 2019, on information and belief, JPMorgan only knew the following information relating to Mr. Turnbull:

    a.  Mr. Turnbull had cooperated with the DOJ's investigation by participating in meetings with government investigators, which JPMorgan first learned in March 2019;

    b.  Mr. Turnbull had met with the DOJ on three occasions, the most recent of which was in that same month of August 2019;

    c.  the DOJ was investigating its precious metals desk for potential wire fraud in violation of 18 U.S.C. § 1343;

d. the DOJ was investigating its precious metals desk for potential spoofing and other manipulative trading practices in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2) and 18 U.S.C. §§ 371, 1344(1), 1348(1), and 1962(d);

e. Mr. Turnbull's interviews with the DOJ were related to these ongoing investigations; and

f. the DOJ's interviews of Mr. Turnbull included questions about JPMorgan's compliance program and the culture and trading practices on its precious metals desk.

61. What JPMorgan did *not* know as of August 2019 was all of the substance of what Mr. Turnbull told government investigators during his three interviews.

62. JPMorgan learned the extent of what Mr. Turnbull told the DOJ for the first time when Bank personnel interviewed Mr. Turnbull two months later on **October 7, 2019** (the "October 7 Interview").

63. On information and belief, JPMorgan understood that Mr. Turnbull had communicated to the DOJ substantially the same information Mr. Turnbull disclosed to the Bank during the October 7, 2019 Interview.

64. On information and belief, by September 21, 2019, JPMorgan learned the identities of the alleged co-conspirators it could not otherwise identify in the original indictment unsealed on September 16, 2019.

65. Mr. Turnbull was not among the alleged co-conspirators in that indictment, or in the November 15, 2019 superseding indictment.

66. On information and belief, JPMorgan knew that Mr. Turnbull was not among the alleged co-conspirators at least after September 21, 2019 and through the October 7 Interview, at the time of Mr. Turnbull's termination, and when the superseding indictment in November 2019 was issued.

67.     At the October 7 Interview, Mr. Turnbull, for the first time, recalls telling Bank investigators, *inter alia,* the following information, most of which he had told the DOJ during his prior interviews with the DOJ:

a. The Bank did not train commodities employees to avoid spoofing until late 2013, more than three years after Congress moved to outlaw the practice;

b. in 2014, when JPMorgan investigated a London-based trader (Trader A) for spoofing, Mr. Turnbull had no knowledge of Trader A's conduct and, at the time, no reason to believe he had engaged in spoofing;

c. later in 2014 during or shortly following the investigation of Trader A, Mr. Turnbull received information from a senior employee and a compliance officer regarding that investigation. In Mr. Turnbull's view, these two senior commodities employees approached him to discuss Trader A's trading practices because they viewed Turnbull as a trader who did not spoof, followed rules, and prized professional integrity;

d. according to the senior employee, the Bank might have shown Trader A more leniency had he acknowledged that his trading practices were designed to combat high-frequency trading algorithms. Based on the employee's representations, Mr. Turnbull believed that it was the Bank's perception of Trader A's dishonesty, not the Bank's belief that Trader A had engaged in spoofing, that had cost Trader A his job. In other words, Mr. Turnbull had the impression that if Trader A had "admitted" his conduct was tantamount to spoofing in 2014, JPMorgan would not have fired him;

e. according to the compliance officer, Trader A claimed that all his colleagues on JPMorgan's precious metals desk used the same trading strategies he did;

f. in light of learning some specifics of Trader A's conduct from the senior employee, Mr. Turnbull believed Trader A's conduct constituted spoofing;

g. when Mr. Turnbull learned of the internal investigation of Trader A, Mr. Turnbull thought that the conduct of a New York employee (Trader B), given his reputation for rapid order entry and cancellation while on both sides of the market, would have been more aggressive than that of Trader A; as a result, immediately following this development, Mr. Turnbull escalated concerns about potential spoofing by Trader B to his manager;

h. in response, Mr. Turnbull's manager told him that the Bank had already rigorously vetted Trader B's conduct and approved his methods for continued use;

i. Mr. Turnbull had also learned that the CME and the CFTC were investigating

15

Trader B for suspected spoofing;

j.  because Mr. Turnbull's manager was considering promoting Mr. Turnbull to
    become Trader B's manager, Mr. Turnbull had for a second time later in 2014
    asked his own manager whether Trader B's conduct might constitute spoofing;

k.  Mr. Turnbull's manager again assured him that the Bank was very comfortable
    with and fully supportive of Trader B's trading practices under regulatory
    investigation;

l.  in 2017, Mr. Turnbull learned that the CME suspended Trader B and levied a fine
    against him personally;

m.  JPMorgan had *paid the fine* levied against Trader B, affirming Mr. Turnbull's
    understanding that JPMorgan fully understood the conduct and viewed the
    regulatory penalty as overzealous and unwarranted;

n.  Mr. Turnbull knew that the Bank had investigated another trader (Trader C) for
    improper trading conduct;

o.  Mr. Turnbull believed the Bank's scrutiny of Trader C was for potential spoofing;

p.  as a result of its investigation, the Bank gave Trader C, who later pleaded guilty to
    spoofing, a verbal warning;

q.  Mr. Turnbull was aware that in 2017 JPMorgan used actual instances of
    Trader C's conduct in compliance training materials on how not to trade –
    because the conduct looked like spoofing;

r.  in Mr. Turnbull's time as a manager at the bank, reports monitoring for potential
    spoofing always went to his supervisor or those at more senior levels than his
    own;

s.  Mr. Turnbull understood a surveillance team, compliance, and trading
    management would regularly review those reports to ensure that no JPMorgan
    precious metals traders were spoofing;

t.  Mr. Turnbull believed that the FOS Report was a "woefully inadequate" box-
    ticking exercise that captured too many false positives to meaningfully detect
    improper trading practices, and that it neither monitored for spoofing nor was it an
    effective monitoring tool otherwise; and

u.  Mr. Turnbull had suggested multiple improvements to the FOS Report, but the
    Bank had told him his recommendations were too complex and that managers
    would "make do" with the unrevised Report.

16

68.     In addition, during the October 7 Interview, Mr. Turnbull offered his opinion as to whether another New York-based trader, Trader D, had manipulated barrier options.

69.     Mr. Turnbull informed JPMorgan investigators that his view was influenced by a transcript of an electronic chat between Trader D and a current employee unaffiliated with metals trading, Trader E.

70.     Mr. Turnbull further informed JPMorgan investigators that he had seen this transcript during an interview with the DOJ and that the transcript appeared inappropriate to him and may have constituted misconduct.

71.     On information and belief, prior to the October 7 Interview, the Bank was not aware of the fact that Mr. Turnbull had conveyed to the DOJ all the information set forth in Paragraphs 55-59 and 67-70.

**IV.     Having Learned the Substance of His Damning Disclosures to the DOJ, JPMorgan Terminates Mr. Turnbull In Retaliation for His Protected Activity**

**A.  The October 7 Interview Changes JPMorgan's View of Mr. Turnbull**

72.     Mr. Turnbull never engaged in "spoofing," "barrier running," "barrier defending," or any other form of market manipulation.

73.     No JPMorgan compliance officer or manager had ever expressed an interest in meeting with Mr. Turnbull to discuss his impeccable trading practices prior to October 2019.

74.     But the crucial October 7 Interview—which took nearly five hours, though it was scheduled to last only 2.5 hours—led to a qualitative shift in how the Bank viewed and treated Mr. Turnbull.

75.     Although the Bank "flagged" a handful of innocuous trading sequences for review at this meeting, the vast majority of the discussion focused on Mr. Turnbull's knowledge of and opinions about his colleagues and the Bank's control mechanisms as set forth in Paragraphs 67-

70.

76.     On information and belief, prior to the October 7 Interview, JPMorgan believed that Mr. Turnbull was conveying to the DOJ the same information that the Bank was conveying to the DOJ.

77.     Before the October 7 Interview, the Bank thought of Mr. Turnbull as an employee who would "toe the line" in support of the Bank's defensive position: that it had not condoned the trading conduct under federal investigation and, in any event, had insufficient knowledge of that conduct to warrant criminal penalties.

78.     During the October 7 Interview, JPMorgan learned that Mr. Turnbull could not and did not corroborate, support, or adhere to the Bank's false narrative of its role in the pattern of admitted and alleged spoofing by its precious metal traders.

79.     During the October 7 Interview, JPMorgan learned, for the first time, that Mr. Turnbull had presented information to the DOJ that documented severe, chronic institutional failures of JPMorgan's training policies, monitoring of market manipulation on the precious metals desk, and its discipline of traders who engaged in potential misconduct, as well as critical and damaging information regarding JPMorgan's training and compliance program on spoofing.

80.     On information and belief, JPMorgan believed that Mr. Turnbull provided the DOJ with his views about certain conduct by JPMorgan and/or its traders that Mr. Turnbull reasonably believed may have violated securities laws and/or regulations.

81.     On information and belief, beginning on October 7, 2019, JPMorgan understood that Mr. Turnbull had already disclosed to the DOJ the sum and substance of what he shared with JPMorgan during the October 7 Interview.

82.     On information and belief, after the October 7 Interview, the Bank viewed Mr.

Turnbull's cooperation with DOJ as a dangerous threat to the non-prosecution bargain the Bank was trying to strike with government prosecutors.

83.     On information and belief, after the October 7 Interview, JPMorgan believed that Mr. Turnbull's account to the DOJ lent credibility to a conclusion that the Bank itself was the most culpable entity in the alleged conspiracy. The Bank therefore decided that the risk Mr. Turnbull represented had to be eliminated.

84.     Immediately after learning what Mr. Turnbull had communicated to the DOJ as alleged in Paragraphs 55-59 and 67-70, the Bank took a number of rushed adverse actions against Mr. Turnbull to neutralize the threat it had just realized he posed.

85.     These actions, which violated the Sarbanes-Oxley Act, were taken in retaliation for Mr. Turnbull's disclosure of information that contradicted the Bank's narrative to the DOJ—and out of concern for what damaging information he might continue to share with the DOJ.

86.     JPMorgan's retaliatory campaign against Mr. Turnbull culminated in the decision to terminate him no more than 24 days after JPMorgan learned what Mr. Turnbull had shared with federal investigators.

**B.  JPMorgan's Initial Adverse and Retaliatory Employment Actions**

87.     JPMorgan commenced its adverse and retaliatory employment campaign against Mr. Turnbull between the October 7 Interview and October 31, 2019.

88.     On October 18, 2019, just 11 days after the October 7 Interview, JPMorgan told Mr. Turnbull that the Bank wanted to discuss additional trading sequences (including those already reviewed on October 7) on October 24, 2019.

89.     On October 21, 2019—three days before the scheduled meeting—JPMorgan informed Mr. Turnbull that, rather than answer questions from management, Mr. Turnbull would

be required to walk through every one of the "flagged" trading sequences in detail.

90.     Mr. Turnbull had already explained to the Bank that he could not recall any of the individual sequences, which all occurred more than six years before the scheduled meeting. Nevertheless, in the spirit of cooperation, he prepared for the interview.

91.     On the evening of October 23, 2019—the day before the scheduled meeting— JPMorgan flagged an additional subset of order sequences for discussion. Although certain of these sequences were duplicative of the previously flagged instances, Mr. Turnbull incorporated them into his review.

92.     On October 24, 2019, JPMorgan conducted its interview of Mr. Turnbull. Though the meeting was scheduled to take only three hours, it lasted nearly seven. During the meeting, JPMorgan invoked surprise "spot data" that Mr. Turnbull had not previously seen and that JPMorgan had not provided to him before the meeting. "Spot data" includes a trader's over-the-counter ("OTC") trades as well as his closely-timed futures trades; it is used to inform how a trader's exposure to a metal's price (known as "delta") evolves.

93.     JPMorgan's reliance on the spot data made no sense. The data could not support inferences of misconduct, and it was decontextualized from other relevant market and positional information, including option positions, unfulfilled OTC orders, and developments among exogenous orders in the OTC market.

94.     The data was also flawed and internally inconsistent. Curiously, it incorporated trades completed by individuals who had been indicted or alleged as co-conspirators and whose conduct had nothing to do with Mr. Turnbull's. When Mr. Turnbull questioned the conflation of those traders' data with his own, JPMorgan investigators—appearing to lose confidence in the integrity of the data—brushed that data aside and asked no further questions on the subject.

95.     At the end of the seven-hour October 24, 2019 interview, JPMorgan directed Mr. Turnbull to resume the discussion the following day. On October 25, 2019, JPMorgan continued to question Mr. Turnbull by phone for an additional hour, focusing on a subset of Mr. Turnbull's orders.

96.     Later that day, JPMorgan informed Mr. Turnbull that he had until the morning of the following business day to supplement the existing record if he wished to do so.

97.     By the morning of October 29, 2019, Mr. Turnbull supplemented the record with an affirmative defense of his trading conduct. On information and belief, the Bank disregarded this supplement.

98.     At the end of the day on October 31, 2019, Mr. Turnbull learned that he had been placed on leave.

99.     On November 3, 2019, Mr. Turnbull logged into his emails to review benefits-related information because of an issue with his wife's health.

100.    At that time, Mr. Turnbull opened an email from his supervisor. The email—not directed to him but mistakenly sent to him—stated, "I will be having a quick call tomorrow morning at 730am est [sic] to brief the participants on Don's departure from the Firm and [another employee's] new role as the head of Precious Metals Trading."

101.    JPMorgan had not yet informed Mr. Turnbull that he had been terminated or otherwise "followed up" with respect to his placement on leave. Mr. Turnbull first learned of his "departure" on a Sunday afternoon through this email directed to other people. JPMorgan informed Mr. Turnbull's peers and colleagues, and intended to inform his own team, before telling him of his termination.

102.    In fact, JPMorgan's decision to place Mr. Turnbull "on leave" was made after the

decision to execute his baseless termination. JPMorgan's benefits department sent Mr. Turnbull a letter indicating that his healthcare coverage would end "[a]s a result of your *Termination* on October 31, 2019" (emphasis added)—but October 31 was the same day JPMorgan had placed Mr. Turnbull "on leave."

103.    The Bank's retaliatory treatment of Mr. Turnbull did not end with his termination.

104.     Despite knowing that Mr. Turnbull's wife suffered from severe health issues, JPMorgan did not notify Mr. Turnbull of his FMLA eligibility of entitlements.

105.    JPMorgan cancelled Mr. Turnbull's substantial unvested shares.

106.    JPMorgan cut off Mr. Turnbull's salary without notice.

107.    JPMorgan awarded Mr. Turnbull no incentive compensation despite an exemplary 2019 performance in the face of severe staff shortages.

108.    JPMorgan offered Mr. Turnbull no severance package.

109.    JPMorgan did not provide Mr. Turnbull with any written notice of the reason for his termination.

110.    The only written document JPMorgan sent to Mr. Turnbull beyond standard benefit-related notices was a threat to claw back certain portions of his compensation.

111.    JPMorgan claimed it terminated Mr. Turnbull because certain of the flagged trading sequences did not meet the Bank's expectations. Despite repeated requests from Mr. Turnbull's counsel, the Bank still did not identify which sequences failed to meet expectations even nine months after his termination in its position statement to OSHA ("OSHA Position Statement").

112.    Of the approximately 53,000 orders reviewed over a 9.5-year period, JPMorgan in July 2020 cited 14 instances—without identifying which instances—as conduct that "could be

perceived as spoofing" as the basis for his termination.

113.    On information and belief, JPMorgan took these adverse actions because management feared the information Mr. Turnbull possessed and previously provided to the DOJ, the views he expressed, and the threat these posed to the Bank's reputation and defense.

114.    Because Mr. Turnbull disclosed damaging information to the DOJ, JPMorgan falsely claimed a "loss of confidence" in Mr. Turnbull to justify his termination and damage his credibility.

### C.  JPMorgan Provides False Evidence to the DOJ to Further Retaliate Against Mr. Turnbull

115.    After terminating Mr. Turnbull, JPMorgan continued its "investigation" into his trading conduct.

116.    On information and belief, in order to destroy Mr. Turnbull's credibility after his termination, JPMorgan attempted to mischaracterize and distort "evidence" to make it appear that Mr. Turnbull had engaged in misconduct.

117.    After reviewing 1.9 million e-communications and various audio recordings of Mr. Turnbull's, JPMorgan in its OSHA Position Statement pointed only to a single day's conversation it purported as "confirm[ing]" JPMorgan's suspicions about one of Mr. Turnbull's orders on August 14, 2013 (the August 14 Trade).

118.    The fulcrum of JPMorgan's false inculpatory narrative on the August 14 Trade is Mr. Turnbull's purported statement, "I'll carry on passing the gold and silver your way; there's actually one more to get out," where the "one" is purportedly in reference to Mr. Turnbull's order for one contract of palladium in the August 14 Trade.

119.    For five reasons, JPMorgan's reliance on this recording as inculpatory with regard to the August 14 Trade was wrong, and the Bank's position betrays its pretextual concerns about

Mr. Turnbull's trades.

   a.  First, the narrative that the recording is inculpatory because Mr. Turnbull

       supposedly implies that he has one more contract to fill in palladium after the call

       is facially implausible: *the August 14 Trade had already concluded before the*

       *recorded conversation took place.*

       - Time stamps on the audio recordings, CME futures data, and
         JPMorgan's risk management system all confirm this sequence of
         events.
       - In the recording, Mr. Turnbull's "one more to get out" could not
         have been referring to an order that was already executed.
       - This basic chronological reality invalidates JPMorgan's
         manipulated narrative.

   b.  Second, as evidenced by multiple references in the recording to "passing" orders,

       the conversation was about OTC orders the precious metals desk was managing

       for clients and internal portfolios—not about the futures market where the

       August 14 Trade occurred.

       - Mr. Turnbull did not "pass" futures market orders to his
         colleagues. That language can only have referred to an OTC order
         in OMI ("Order Market Intelligence"), an order management
         system for precious metals and FX.

   c.  Third, JPMorgan ignored that Mr. Turnbull and his colleague were explicitly

       discussing gold and silver.

       - The August 14 Trade was in the palladium market.
       - Mr. Turnbull and his colleague were not discussing palladium at
         that point of the conversation – the "one more" had to refer to an
         order in gold or silver.

   d.  Fourth, Mr. Turnbull did not place, cancel, change, receive fills on, or have

       working a single order in the gold or silver futures markets that day.

       - On that basis, Mr. Turnbull's reference to "passing" gold and silver
         orders could not have been referring to futures orders which *did*

24

*not exist* – further confirmation that Mr. Turnbull was not referring to futures orders at all but to OTC orders in OMI.

    e.   Fifth, and finally, JPMorgan asserts that Mr. Turnbull said: "There's actually one more to get out," inferring this phrase refers to a purported spoof to secure a "fill" of one contract.

- This transcription of the audio recording is incorrect.
- While the recording of the phrase at issue is difficult to decipher, Mr. Turnbull clearly did not say "one more to get out."

120.    On information and belief, JPMorgan had already reviewed the August 14 Trade in a full 2014 review of the trading conduct of all precious metals traders, and the Bank had previously concluded it was not spoofing.

121.    Had Mr. Turnbull been filled on the order JPMorgan now belatedly and pretextually characterizes as a "spoof," it would have reduced his risk to the palladium price by approximately 65 percent. The one contract on which Mr. Turnbull was filled marginally increased his exposure to the market.

122.    Even had Mr. Turnbull been spoofing—which he was not—that instance of market manipulation would have secured an improved fill on one contract of palladium, which would have provided a benefit to JPMorgan of $25.

123.    The revenue on the trading portfolios ("P&L") over which Mr. Turnbull had almost exclusive charge was approximately $20 million in 2013.

124.    JPMorgan's "theory" that Mr. Turnbull spoofed for no discernable benefit to himself is untenable.

125.    JPMorgan mistranscribed the very phrase on which the inculpatory narrative depends.

126.    On information and belief, JPMorgan's mistranscription was not an accident.

127.     JPMorgan ignored four further readily-identifiable facts in its false inculpatory narrative. Each of those facts would individually invalidate that narrative. One of those facts— the time discrepancy—renders that narrative factually impossible.

128.     JPMorgan disregarded its own prior conclusion that the conduct was bona fide and took the belated, unsupportable position that Mr. Turnbull's purported criminality is "confirm[ed]" most clearly by an *arguendo* benefit of $25 to the Bank.

129.     Not satisfied with drawing unsupportable conclusions about the audio recording for itself alone, JPMorgan provided the recording and mistranscription to the DOJ.

130.     In addition, JPMorgan, upon information and belief, communicated its self-serving views and false allegations about the recording to the DOJ.

131.     On information and belief, JPMorgan took these steps to undermine Mr. Turnbull's credibility, thereby reducing its potential institutional culpability.

132.     Furthermore, on information and belief, JPMorgan was aware at the time of the fact that Mr. Turnbull was not among the alleged co-conspirators in the DOJ indictments.

133.     This fact was problematic if the Bank wished to both discredit Mr. Turnbull's account and thwart his potential claim of retaliation.

134.     On information and belief, the inescapable conclusion is that JPMorgan undertook these actions in a deliberate effort to inculpate Mr. Turnbull in the alleged spoofing conspiracy— knowing that its actions could precipitate criminal charges—making this added retaliatory step extraordinary for its facially disingenuous foundations and potentially devastating consequences on Mr. Turnbull's personal and professional future.

135.     In any event, JPMorgan clearly did not rely on this *post hoc* audio recording as a basis for termination because the Bank admits in its OSHA Position Statement that it only

26

"uncovered" it after Mr. Turnbull's termination.

136.    The Bank's falsehoods and fabrications in relation to its reliance on the audio "transcription" reveal the lengths to which the Bank went to discredit and punish Mr. Turnbull for undermining JPMorgan's defense to the DOJ.

**V.    Mr. Turnbull's Protected Activity Was a Contributing Factor to His Termination from JPMorgan**

137.    JPMorgan terminated Mr. Turnbull in secret. Mr. Turnbull, who served the Bank for nearly fifteen years with excellence and integrity, learned he had been fired from an email intended only for others. The Bank did not offer Mr. Turnbull an exit interview; it never sent him a termination letter. And, despite repeated requests for an explanation from counsel, JPMorgan never gave Mr. Turnbull a substantive reason for his termination other than invoking vague references to the potential appearance of misconduct.

138.    The reasons are clear. Mr. Turnbull's trading data and communication records had not changed between 2013 and October 2019. What changed was the Bank learning at the October 7 Interview the nature of Mr. Turnbull's participation in the DOJ's investigation—specifically, his disclosure to the DOJ of information about JPMorgan's serious institutional failures to provide proper guidance, surveillance, and enforcement on trading conduct.

139.    The Bank terminated Mr. Turnbull just 24 days after the October 7 Interview, during which JPMorgan learned what Mr. Turnbull had told the DOJ about Bank's flawed oversight and controls as delineated in Paragraphs 55-59 and 67-70.

140.    JPMorgan's supposed "reason" for terminating Mr. Turnbull is pretextual.

141.    All of the trading sequences on which JPMorgan purportedly based its termination of Mr. Turnbull occurred more than six years before the Bank took adverse actions against him.

142.    JPMorgan's realization, as a consequence of the October 7 Interview, that Mr. Turnbull had made disclosures harmful to the Bank to the DOJ as recently as August, 2019, was a contributing factor in his October 31, 2019 termination.

**A. JPMorgan's Purported Reason for Terminating Mr. Turnbull Was Pretextual**

143.    To cover up its real reason for ousting Mr. Turnbull, JPMorgan pretextually stated that it had terminated him for trading in a manner that *might look like* spoofing – pointing to orders that occurred exclusively before Mr. Turnbull was trained to avoid the risk of such a possible appearance.

144.    Notably, in JPMorgan's first written justification for terminating Mr. Turnbull— its OSHA Position Statement—JPMorgan did not accuse Mr. Turnbull of engaging in spoofing.

145.    Instead, of the more than tens of thousands of orders that Mr. Turnbull placed over a 9.5-year period, the Bank cherry-picked a handful of non-spoofing trading sequences that it suggested "could be perceived as" spoofing in its July 2020 OSHA Position Statement.

146.    This "justification" was pretextual.

147.    All available evidence shows that Mr. Turnbull did not engage in spoofing on the occasions JPMorgan flagged—and that JPMorgan knew he had not done so.

148.    Supervisors praised Mr. Turnbull's handling of risks and controls, and regularly gave him exemplary reviews, often awarding him the Bank's top internal annual rating of E ("exceeds expectations").

149.    According to a JPMorgan compliance officer in London, when JPMorgan investigated Trader A for potential spoofing in 2014, Trader A claimed that "everyone" [all precious metals traders] were trading in the same manner that he was.

150.    As a result of Trader A's claim, JPMorgan undertook a comprehensive historical

review of "all" the trading of "all" precious metals traders, *including Mr. Turnbull*. Further, according to the compliance officer, JPMorgan found that none of the precious metals traders (*including Mr. Turnbull*) other than Trader A were suspected of potential spoofing.

151.    All of the 14 instances "flagged" by JPMorgan had occurred prior to this 2014 review, and in that review JPMorgan concluded that none of Mr. Turnbull's orders—including, on information and belief, the "flagged" orders—were consistent with spoofing.

152.    JPMorgan promoted Mr. Turnbull several times following this investigation and review of his trading conduct.

153.    While JPMorgan flagged certain trades in which Mr. Turnbull was on both sides of the market, there is nothing inherently suspect about this scenario. In his capacity as a "market-maker" (that is, one who quotes financial market bids *and* offers), Mr. Turnbull regularly managed opposing orders for reasons ranging from market-making (quoting with intent to trade either side), capturing spread (seeking to buy low and sell high on a single financial instrument around the same time), "jobbing" a position (seeking to capture spread to improve profitability while accruing or reducing a position), and arbitrage (trading based on opportunities in a related market while accruing or reducing a position). Mr. Turnbull engaged in these strategies regularly, often more than one simultaneously, and occasionally made mistakes as well (what traders refer to as a "fat finger"). The existence of orders on both sides of the market does not, in and of itself, suggest spoofing.

154.    JPMorgan was aware that Mr. Turnbull, like many other traders at the bank, was a "market-maker" who would regularly and legitimately have orders on both sides of the market.

155.    JPMorgan trained commodities traders on spoofing for the first time in 2013.

156.    During the training, JPMorgan compliance officers advised traders not to trade

even "in a manner that could potentially be perceived as spoofing."

157.    Of the 14 instances from Mr. Turnbull's trading history that JPMorgan "flagged," all occurred prior to this training. JPMorgan did not "flag" a single order placed after this training, basing Mr. Turnbull's termination entirely on a small handful of orders that were more than six years old and had been previously reviewed and approved.

158.    On information and belief, JPMorgan knew, and still knows, that Mr. Turnbull never spoofed.

159.    On information and belief, JPMorgan knew, and still knows, that Mr. Turnbull heeded compliance advice when it was given to avoid trading in a manner that could even potentially be perceived as spoofing.

160.    JPMorgan terminated Mr. Turnbull anyway.

161.    JPMorgan's "basis" for terminating Mr. Turnbull is particularly specious in light of objective factors that speak to whether a trader engaged in spoofing, including, but not limited to: (i) the number of "flagged" sequences relative to the trader's entire order history; (ii) the amount of money the trader, his clients, and the Bank stood to gain in the flagged sequences; and (iii) the speed with which those sequences were executed, both in absolute terms and relative to non-flagged sequences.

162.    Each factor affirms that Mr. Turnbull was not spoofing on any of the occasions the Bank flagged.

            i.      **Number of flagged sequences relative to Mr. Turnbull's order history**

163.    Traders who are suspected to have engaged in spoofing generally do so often. For example, the DOJ stated that 54,456 trading sequences—and likely many more orders— "underlie the charges" in the superseding indictment. Likewise, two of the DOJ defendants

allegedly "repeatedly engaged in" spoofing by "placing *thousands* of orders with the intent to cancel them."

164.    In contrast, JPMorgan reviewed only a handful of order sequences with Mr. Turnbull—a small fraction out of many tens of thousands of orders he placed over the relevant period. The 14 sequences JPMorgan flagged constitute *less than 0.03 percent* of Mr. Turnbull's total trading activity over the period examined. Traders who spoof tend to do so frequently at regular intervals, as a pattern. But Mr. Turnbull's "flagged" orders are so rare as to be statistically anomalous: one out of every 3,786 orders does not remotely constitute a "trading pattern." His trading history is nothing like the records set forth in the indictments.

165.    The stark difference in volume between Mr. Turnbull's scant handful of "flagged" trades and the vast array completed by other traders is particularly evident by comparison with examples in the indictments. One trader—indicted based on 38,146 sequences—in a single sequence placed *ninety-one* "deceptive" orders. Similarly, a supervisor—indicted based on 3,603 sequences—in a single sequence placed *thirty-three* "deceptive" orders. In single instances, both traders placed more orders that yielded criminal charges than Mr. Turnbull, over his entire career, placed orders that JPMorgan belatedly claims "could be perceived as spoofing."

    **ii.    Value of the flagged sequences relative to Mr. Turnbull's P&L**

166.    The *de minimis* financial value of Mr. Turnbull's flagged trading sequences further demonstrates that he was not engaged in spoofing.

167.    Traders engage in spoofing to make more money for themselves, their employers, and their clients. Absent financial gain, there is no reason to spoof.

168.    Mr. Turnbull's flagged trades would have earned negligible income either for the Bank or for himself.

169.     Hypothetically, had Mr. Turnbull spoofed on all 14 "flagged" occasions—and he did not spoof on any—the effect on his performance metrics would have been imperceptible. Assuming *arguendo* that Mr. Turnbull had been spoofing, the strategy would have achieved additional P&L of less than an average of $700 per year over the four years in question, representing approximately 0.004 percent of his P&L over the years in question.

170.     Likewise, assuming a rate of compensation proportional to Mr. Turnbull's P&L, the alleged spoofing would have yielded less than $28 per year after taxes for Mr. Turnbull himself, an amount for which he would not have risked his job, career, or reputation.

### iii.     Speed with which the flagged orders were cancelled

171.     The lengths of time for which Mr. Turnbull kept his flagged orders open and working also show that he was not spoofing.

172.     Traders who spoof cancel their deceptive orders quickly lest they be inadvertently executed, eliminating or reversing any potential financial gains.

173.     Traders identified by law and regulatory enforcement routinely cancelled "deceptive" orders well under one second—in many cases, less than *half a second*—after placement.

174.     All of Mr. Turnbull's "flagged" orders were live and executable for more than *two* seconds, and the vast majority were so for more than three seconds.

175.     All other things being equal, Mr. Turnbull's cancellation rates were consistent when he had orders on both sides of the market and when he did not. Every order Mr. Turnbull placed intentionally was done so with an intent to trade.

## VI.     JPMorgan Treated Mr. Turnbull More Severely Than Individuals Indicted or Implicated as Co-Conspirators

176.     JPM's retaliation is especially clear in light of the obvious differences between its

treatment of Mr. Turnbull and its treatment of precious metals employees who pleaded guilty, were otherwise indicted, or were implicated as alleged co-conspirators in the DOJ indictments.

177.    JPMorgan claimed in its July 2020 OSHA Position Statement that it terminated Mr. Turnbull for trading in a manner that "could have the appearance of spoofing" because it "potentially exposed" the Bank to regulatory scrutiny.

178.    JPMorgan did not apply this standard to other precious metals traders.

179.    A New York-based trader was employed by JPMorgan between 2006 and 2009. JPMorgan knew about his trading data and chat transcripts, which underlie the charges against him in the superseding indictment. Nevertheless, JPMorgan continued to employ him even though the Bank used an excerpted chat transcript of his as a training documents to illustrate dialogue conveying the appearance of manipulative intent. And, although he purportedly had two further unrelated conduct violations, JPMorgan did not subject the trader to discipline. It released him favorably with severance, a substantial financial award, and other benefits not offered to Mr. Turnbull. This trader was subsequently indicted by the DOJ.

180.    Another New York-based trader was employed by JPMorgan between approximately 2004 and 2017. Although JPMorgan had long surveilled his trading data and chat transcripts, he was released favorably in 2017. He pleaded guilty to spoofing the following year.

181.    Trader C was employed by JPMorgan between 2008 and 2019. JPMorgan recognized that Trader C's trading practices "could be perceived as spoofing" when it began an internal investigation of his conduct in 2016. JPMorgan—having concluded that his conduct did not meet company standards—issued a verbal warning. But Trader C's conduct so obviously violated JPMorgan's "could be perceived as spoofing" "standard" that the Bank used examples of his order sequences in employee training materials as illustrations of how not to trade—

33

because the conduct looked like spoofing. Nevertheless, JPMorgan retained him in its employ until he resigned three years later to plead guilty to eight years of spoofing. A related CFTC enforcement action acknowledged that he placed "thousands" of spoof orders. On information and belief, JPMorgan kept Trader C employed following the 2016 investigation of his conduct *because he admitted* that his trading methods were tantamount to spoofing.

182.    A precious metals supervisor was employed by JPMorgan between approximately 1996 and 2019. He was indicted in 2019 for thousands of alleged instances of spoofing, yet he remained in JPMorgan's employ until after his indictment was unsealed in September 2019.

183.    Trader B was employed by JPMorgan between 2008 and 2019. His trading record, more than just "potentially expos[ed]" JPMorgan to regulatory scrutiny; it attracted multi-year scrutiny from the CME and CFTC. Strategies under investigation from 2013 continued until 2015, and in the intervening period Mr. Turnbull's reports to supervisors were confidently and reassuringly dismissed by multiple Bank authorities on at least three occasions. Nevertheless, regulatory scrutiny did not end there, and in 2017 it resulted in a suspension for Trader B and a personal fine, which JPMorgan paid on his behalf. In 2019 Trader B was indicted for tens of thousands of sequences of spoofing, yet he remained in JPMorgan's employ without any discipline until after that indictment was unsealed.

184.    A precious metals salesperson was employed by JPMorgan between 2008 and 2017. He was indicted in November 2019 in connection with spoofing by JPMorgan precious metals traders. The Bank had previously released him favorably in 2017.

185.    JPMorgan first trained employees to avoid trading in a manner that might risk even the appearance of spoofing in late 2013. *The Bank has not questioned a single order that Mr. Turnbull placed after this training*. By contrast, Traders A, B, C, and D and a precious

metals supervisor—including all indicted individuals in JPMorgan's employ following this training—engaged in widespread, allegedly manipulative conduct after this training.

186.    But JPMorgan did not terminate any of those indicted for "trading in a manner that could be perceived as spoofing." Instead, for years it approved the conduct for continued use, defended it to regulators, and continued to employ these individuals, releasing them favorably from the firm or terminating them only as a result of their indictments.

187.    On information and belief, at the time of Mr. Turnbull's termination, at least four of the alleged co-conspirators had been released from the firm favorably (including an individual who bragged about spoofing in an electronic chat), and at least one of the alleged co-conspirators remained employed by JPMorgan and had not been interviewed by the Bank about his own trading conduct.

188.    Mr. Turnbull was not among the alleged co-conspirators in the August 2019 or November 2019 indictments, the latter of which post-dated his termination.

189.    JPMorgan treated Mr. Turnbull worse than each of the alleged "bad actors," none of whom voluntarily cooperated with the DOJ while employed by JPMorgan.

190.    JPMorgan fired Mr. Turnbull—who had never been disciplined over the course of his entire career, cooperated fully with the DOJ's investigation, and was neither indicted nor among the alleged co-conspirators in the DOJ indictments—without a proper internal hearing, FMLA benefits, his unvested shares, a severance package, or a substantive explanation.

191.    These actions were far more punitive than the Bank's favorable treatment of traders indicted or implicated as co-conspirators in the DOJ's investigation. JPMorgan—which, for years, defended traders with tens of thousands of admittedly or allegedly manipulative trading sequences—"determined," more than six years after the fact, that Mr. Turnbull's

exemplary trading practices somehow justified termination.

192.     This self-serving firing was entirely disproportionate as compared to the treatment of traders who admitted or who were charged with spoofing. It was pretextual. It was retaliatory. And it was unlawful under the Sarbanes-Oxley Act.

**CAUSE OF ACTION**
**(Unlawful Retaliation Pursuant to Section 806 of the Sarbanes-Oxley Act,**
**18 U.S.C. § 1514A)**

193.     Mr. Turnbull repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

194.     A publicly traded company like JPMorgan cannot "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee" because the employee:

> Testif[ies], participate[s] in, or otherwise assist[s] in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. §1514A(a)(2).

195.     Mr. Turnbull participated and assisted in the DOJ's investigation of the JPMorgan precious metals desk, which constitutes a proceeding filed relating to an alleged violation of 18 U.S.C. §§ 1343 and 1344(1), as set forth in 18 U.S.C. § 1514A(a)(2).

196.     JPMorgan knew that Mr. Turnbull had participated in the DOJ investigation.

197.     In October 2019, JPMorgan learned for the first time that Mr. Turnbull disclosed damaging information about the Bank's handling of manipulative trading on its precious metals desk to the DOJ during his earlier interviews with government investigators.

198.     Mr. Turnbull's meetings with and the information disclosed to DOJ investigators

"constitute[] admissible evidence" of his engagement in protected activity. *Yang v. Navigators Grp., Inc.*, 674 F. App'x 13, 14-15 (2d Cir. 2016).

199.    Mr. Turnbull's participation in, and cooperation with, the DOJ's investigation of manipulative trading on JPMorgan's precious metals desk was a contributing factor in the retaliatory actions JPMorgan took against him, and by reason thereof, JPMorgan violated 18 U.S.C. § 1514A.

200.    The substance of Mr. Turnbull's disclosures to DOJ investigators—of which JPMorgan became aware on October 7, 2019—was a contributing factor in the retaliatory actions JPMorgan took against Mr. Turnbull, including but not limited to his October 31, 2019 termination.

201.     By reason thereof, JPMorgan violated 18 U.S.C. § 1514A.

202.    "A reasonable juror could find that the string of retaliatory acts culminating in [Turnbull's] termination is evidence that [Turnbull's] protected activity was a contributing factor in the adverse employment action." *Mahony v. Keyspan Corp.*, No. 04 Civ. 554, 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007).

203.    As a result of JPMorgan's actions, Mr. Turnbull has suffered damages, including but not limited to lost earnings, lost unvested stock, and damages to his reputation that will diminish his future earnings and earning capacity.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

a.    Awarding compensatory damages to make Plaintiff whole, including but not limited to damages to reputation, unvested compensation pursuant to 18 U.S.C. § 1514A(c)(1), back pay pursuant to 18 U.S.C. § 1514A(c)(2)(B), and front pay pursuant to 18 U.S.C. § 1514A(c)(1), in an amount to be determined at trial,

together with interest;

b.  Reinstating Plaintiff to his position at JPMorgan as of termination pursuant to

18 U.S.C. § 1514A(c)(2)(A);

c.  Awarding Plaintiff reasonable attorneys' fees and costs pursuant to 18 U.S.C.

§ 1514A(c)(1) and (2)(C); and

d.  For such other and further relief as the Court deems just and proper.

Dated: March 28, 2022
       New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


By:  ___/s/ Richard Emery_____
        Richard Emery
        O. Andrew F. Wilson
        Emma L. Freeman
     600 Fifth Avenue, 10th Floor
     New York, New York 10020
     (212) 763-5000

*Attorneys for Plaintiff Donald Turnbull*