**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178-0060
Tel.:  (212) 309-6000
Fax:  (212) 309-6001

Attorneys for Defendant
JPMorgan Chase & Co.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

DONALD TURNBULL,

        Plaintiff,

    v.

JPMORGAN CHASE & CO.,

        Defendant.

Case No. 21-cv-03217-JGK

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JPMORGAN CHASE & CO.'S
## MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Sarah E. Bouchard (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001

Gina F. McGuire
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Fax: (212) 309-6100

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL & PROCEDURAL BACKGROUND ...................................................... 4

    I.      PLAINTIFF'S ALLEGATIONS AGAINST JPMORGAN ............................... 4

            A.     Plaintiff's Employment History. .............................................. 4

            B.     The DOJ's Investigation of JPMorgan's Precious Metals Desk. ............... 4

            C.     Turnbull's Interviews with the DOJ. ....................................... 5

            D.     The DOJ August 2019 Indictment. .......................................... 6

            E.     JPMorgan Interviews Plaintiff as Part of Its Internal Investigation and Terminates His Employment Based on Those Interviews and Its Review of Turnbull's Trades. ............................ 6

            F.     The DOJ November 2019 Superseding Indictment. ................................ 7

    II.     THE SEPTEMBER 2020 DEFERRED PROSECUTION AGREEMENT AND UPCOMING 2022 CRIMINAL TRIALS OF INDIVIDUAL DEFENDANTS ........................................................................................ 8

            A.     The DPA Confirms that Plaintiff Engaged in Unlawful Trading Activity. ............................................................ 8

            B.     The DPA Also Confirms JPMorgan's Cooperation with the DOJ. ........... 9

            C.     Turnbull Has Been Named As a Co-Conspirator in the Upcoming Criminal Smith Trial. ........................................ 10

    III.    PLAINTIFF'S CLAIMS AND THE SECOND AMENDED COMPLAINT .................................................................................... 11

LEGAL STANDARD ........................................................................................... 12

ARGUMENT ........................................................................................................ 13

    I.      PLAINTIFF HAS NOT PLAUSIBLY ALLEGED THAT HIS PURPORTED PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR IN HIS TERMINATION, AND THUS FAILS TO STATE A PRIMA FACIE CLAIM UNDER SOX ............................................ 13

            A.     Plaintiff Fails to Plead a Causal Connection Between His DOJ Interviews and His Termination. ........................ 13

            B.     Allegations Upon "Information and Belief" Are Insufficient to Meet Plaintiff's Burden to Show His DOJ Interviews Contributed to His Termination. ................................. 14

            C.     The Passage of Time Between Plaintiff's DOJ Interviews and His Termination Does Not Support an Inference of Retaliation. ................... 16

# TABLE OF CONTENTS
(continued)

II.    PLAINTIFF'S CLAIM THAT HE WAS TERMINATED FOR PARTICIPATION IN A DOJ INVESTIGATION THAT JPMORGAN ITSELF COOPERATED WITH IS FACIALLY IMPLAUSIBLE..................... 16

    A.    JPMorgan Did Not Retaliate Against a Cooperating Witness. ............... 16

    B.    Turnbull's Allegations That JPMorgan's Termination Reason Was Pretextual Are Also Wrong and Implausible. ......................................... 19

III.    ALLOWING PLAINTIFF TO AMEND THE COMPLAINT  A THIRD TIME WOULD BE FUTILE ............................................................................. 21

CONCLUSION.................................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJ Energy LLC v. Woori Bank,*
829 F. App'x 533 (2d Cir. 2009) ................................................................................17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...............................................................................................12, 16

*Bechtel v. Admin. Rev. Bd., U.S. Dep't of Labor,*
710 F.3d 443 (2d Cir. 2013) .......................................................................................21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..............................................................................................12, 18

*Brown v. Colonial Sav. F.A.,*
No. 16-cv-0884, 2017 WL 354246 (N.D. Tex. Jan. 23, 2017) ..................................15

*Cellucci v. O'Leary,*
No. 19-cv-2752, 2020 WL 977986 (S.D.N.Y. Feb. 28, 2020) ...................................14

*Charter Commc'ns., Inc. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,*
338 F. Supp. 3d 242 (S.D.N.Y. 2018) ........................................................................21

*Douramanis v. Dur-Am. Brokerage Inc.,*
No. 20-cv-5825, 2021 WL 961761 (S.D.N.Y. Mar. 15, 2021) ..................................21

*Egan v. TradingScreen, Inc.,*
No. 10-cv-8202, 2011 WL 4344067 (S.D.N.Y. Sept. 12, 2011) ...............................15

*Fraser v. Fiduciary Tr. Co. Int'l,*
417 F. Supp. 2d 310 (S.D.N.Y. 2006) ........................................................................14

*Gallop v. Cheney,*
642 F.3d 364 (2d Cir. 2011) .......................................................................................17

*Guitron v. Wells Fargo Bank, N.A.,*
619 F. App'x 590 (9th Cir. 2015) ...............................................................................21

*Harris v. Mills,*
572 F.3d 66 (2d Cir. 2009) .........................................................................................17

*Hemphill v. Celanese Corp.,*
430 F. App'x 341 (5th Cir. 2011) ...............................................................................21

iii

*Houlahan v. Raptor Trading Sys., Inc.*,
No. 16-cv-9620, 2018 WL 3231662 (S.D.N.Y. Feb. 12, 2018) ............................................20

*Kim v. Boeing Co.*,
487 F. App'x 356 (9th Cir. 2012) ............................................................................21

*Neitzke v. Williams*,
490 U.S. 319 (1989) ...........................................................................................12

*Rimini v. JP Morgan Sec. LLC*,
No. 18-cv-1031, 2018 WL 11229124 (1st Cir. Nov. 7, 2018) ................................15

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ...............................................................................19

*Tonra v. Kadmon Holdings, Inc.*,
405 F. Supp. 3d 576 (S.D.N.Y. 2019) (Koeltl, J.) ...........................................13, 14, 20

*United States v. Smith, et al.*,
19-cr-00669 (N.D. Ill.) .................................................................................10, 18

*USA v. JPMorgan Chase & Co.*,
No. 20-cr-00175 (D. Conn. 2020) ............................................................................8

*Villella v. Chem. & Mining Co. of Chile Inc.*,
No. 15-cv-2106, 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .............................8

*Wallace v. Tesoro Corp.*,
No. 11-cv-0099, 2017 WL 6403117 (W.D. Tex. Feb. 23, 2017) ............................21

*Wallender v. Canadian Nat'l Ry. Co.*,
No. 13-cv-2603, 2015 WL 10818741 (W.D. Tenn. Feb. 10, 2015) .......................22

**Statutes**

18 U.S.C. § 1514A........................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6).....................................................................1, 2, 12, 21

## PRELIMINARY STATEMENT

On February 24, 2022, this Court dismissed Plaintiff Donald Turnbull's First Amended Complaint, which alleged wrongful termination in violation of the anti-retaliation provisions of the Sarbanes-Oxley Act ("SOX").  *See* Dismissal Order ("Order") (ECF No. 40).  In that legally deficient pleading, Plaintiff alleged that he was wrongfully terminated because of his participation in three Department of Justice ("DOJ") interviews.  This Court disagreed, concluding that Plaintiff's "allegations as to JPMorgan's motivation for his termination are completely conclusory and implausible."  In so holding, this Court stated that at the time of Plaintiff's termination:

> JPMorgan was undergoing intense scrutiny by the DOJ in 2019, and, as plaintiff alleges, it was aware of that scrutiny.  This awareness makes it implausible that the defendant would have terminated an employee for cooperating with the DOJ when JPMorgan was also attempting to cooperate.  Firing a cooperating employee because the employee was also cooperating would be extremely counterproductive. Rather, the plaintiff's own allegations make it clear that JPMorgan examined the plaintiff's own activities and found them questionable and those activities formed part of JPMorgan's [Deferred Prosecution Agreement with the DOJ.]

Order at 14-15.

Despite that clear ruling, Plaintiff filed yet another pleading – his third attempt in this action.  Yet, the Second Amended Complaint does not – and cannot – correct these fundamental and immutable flaws.  To the contrary, the allegations added by Plaintiff confirm that the SAC fails to plead a prima facie SOX claim because it fails to plausibly plead that Turnbull's DOJ interviews were a contributing factor in his termination.  Plaintiff also continues to omit critical context regarding his trading activity, which was the sole basis for the termination decision. Plaintiff has had two opportunities to amend and yet remains unable to put forth enough facts to state a plausible claim for relief.  The SAC should be dismissed again, with prejudice, under Rule 12(b)(6).

The crux of Plaintiff's claim is that, based on answers he purportedly gave in response to JPMorgan's questions during his October 7, 2019 internal interview, JPMorgan "learned" that he shared information harmful to JPMorgan during his DOJ interviews earlier in the year.  Compl. ¶ 1.  Plaintiff goes on to assert that, following his October 7 interview, JPMorgan initiated and rushed a "faux inquiry" into his "unimpeachable" trading history, and pretextually terminated him on the basis that fourteen trades identified by JPMorgan "could be perceived as [unlawful]."  *Id.* ¶¶ 12, 112.  But the SAC pleads no facts to support these contentions.  It continues to be devoid of allegations that JPMorgan had actual knowledge of what Turnbull told the DOJ.  In fact, the only connection in the SAC between Turnbull's purported statements to the DOJ and JPMorgan's knowledge of the substance of those statements are allegations based on "information and belief" regarding what JPMorgan must have "believed" to be true regarding his DOJ interviews following October 7.  Compl. ¶¶ 63, 80-83, 113.  This conclusory pleading is fatal to Turnbull's claim and cannot withstand Rule 12(b)(6) scrutiny.

Plaintiff's amended pleading also purposefully omits that, following its investigation of JPMorgan's precious metals desk, **the DOJ determined that Turnbull had engaged in unlawful trading activity**.  On September 29, 2020, the DOJ and JPMorgan entered into a Deferred Prosecution Agreement ("DPA") that memorialized a resolution reached between JPMorgan and the DOJ regarding the DOJ's precious metals investigation.  *See infra* 8-10.  The DPA refers to Turnbull as a trader who engaged in unlawful trading activity and specifically cites an August 14, 2013 example of illegal market manipulation by Turnbull.  *Id.*  The DOJ has also named Turnbull as a **co-conspirator** in the current criminal case against four former JPMorgan traders set for trial

in July and November of this year.  *See infra* 10-11.[1]  Moreover, despite his contention that his trading was never questioned prior to October 2019, Turnbull was well aware that there was an investigation into his trading as early as April 2019 (including the trade referenced in the DPA), as evidenced by his own counsel's email to JPMorgan at that time.  *Infra* 19-20.  Plaintiff's claim that JPMorgan pretextually fabricated his problematic trades, and intentionally provided falsified evidence regarding those trades to the DOJ, after his October interview is fictitious and entirely implausible.

With this context, it is no surprise that Turnbull now tries to assert that his mere participation in a government interview is somehow a talisman against termination for the misconduct that was investigated by both the government and JPMorgan.  It is not.  SOX shields from retaliation whistleblowers who speak out to protect shareholders and the market; it does not shield individuals who themselves engage in market manipulation from the employment consequences of their own misconduct.  Plaintiff's assertion that he was terminated for cooperating with the DOJ while JPMorgan was also cooperating remains implausible, and the SAC should be dismissed.

---

[1] Turnbull's efforts to undermine the import and credibility of the DPA only serve to underscore the absurdity of his claim.  ECF No. 20 (Plaintiff's Letter-Motion for Partial Redaction) (Filed Under Seal).  To accept Plaintiff's allegations as true means accepting his theory that DOJ prosecutors across two presidential administrations colluded with JPMorgan to include Turnbull in the DPA and name him as a co-conspirator to further JPMorgan's purported retaliation against him.

## FACTUAL & PROCEDURAL BACKGROUND[2]

### I.   PLAINTIFF'S ALLEGATIONS AGAINST JPMORGAN

#### A.   Plaintiff's Employment History.

Plaintiff began working for JPMorgan in 2005 as an analyst on JPMorgan's precious metals desk.  Compl. ¶ 26.  Precious metals include naturally occurring, high-value metals such as gold, silver, platinum, and palladium.  *Id.* ¶ 36.  Through the years, Turnbull held different positions and titles on the desk.  In 2017, he was appointed as the Global Head of Precious Metals Trading and was promoted to Managing Director in 2018.  *Id.* ¶ 29.

#### B.   The DOJ's Investigation of JPMorgan's Precious Metals Desk.

Turnbull alleges that by October 2018, the DOJ had begun to investigate the JPMorgan precious metals desk "for allegedly engaging in an illegal trading practice known as 'spoofing.'"  *Id.* ¶ 32.  As defined by the SAC, "spoofing" refers to a trader's placement of an order to buy or sell futures contracts with the intent to cancel that order before it is executed, in an effort to manipulate the market and yield favorable prices for the trader, the trader's employer, and/or the trader's clients.  *Id.* ¶¶ 5, 34-35, 40-41.

In October 2018, John Edmonds, a former JPMorgan precious metals trader, pled guilty to commodities fraud and a spoofing conspiracy in connection with his participation in alleged fraudulent and deceptive trading activity in the precious metals futures contracts market between 2009 and 2015.  *See* Exhibit ("Ex.") A (Edmonds Plea Agreement), attached hereto to the Declaration of Sarah E. Bouchard (hereinafter "Bouchard Decl.").  As part of his plea, Edmonds admitted that he "and his fellow [precious metals] traders [at the Bank] routinely placed . . . orders

---

[2] The facts set forth herein reflect the facts as alleged in the SAC, except where otherwise stated.  JPMorgan denies all allegations by Plaintiff and denies having engaged in any wrongdoing alleged by Plaintiff.

. . . for precious metals futures contracts with the intent to cancel those bids and offers before execution (the 'Spoof Orders')," and further admitted that he "learned this deceptive trading strategy from more senior traders at the Bank." *Id.* at 10.

### C. Turnbull's Interviews with the DOJ.

In connection with the DOJ's investigation of JPMorgan's precious metals desk, Turnbull alleges that the DOJ "asked [him] for a confidential interview", and that he participated in three interviews with the DOJ, the first in March 2019 and the last in August 2019.  Compl. ¶¶ 6, 54. Turnbull further alleges that he "answer[ed] every question [DOJ] investigators asked." *Id.* ¶ 54. Despite the admitted confidential nature of the DOJ interviews, the SAC asserts that Plaintiff "provided the DOJ with information that revealed significant, multi-year lapses in JPMorgan's trading oversight mechanisms and enforcement judgments" and "recalls telling the DOJ" purported information regarding traders and trading on the precious metals desk. *Id.* ¶¶ 6, 55-59.

Turnbull alleges that JPMorgan learned in March 2019 that he "had cooperated with the DOJ's investigation by participating in meetings with governmental investigators." *Id.* ¶ 60(a).  In addition, Turnbull asserts that prior to October 2019 JPMorgan knew that:  "Mr. Turnbull had met with the DOJ on three occasions," most recently in August 2019; the DOJ was investigating its precious metals desk for potential wire fraud, spoofing, and other manipulative trading practices; Turnbull's interviews with the DOJ "were related to these ongoing investigations;" and "the DOJ's interview of Mr. Turnbull included questions about JPMorgan's compliance program and the culture and trading practices on its precious metals desk." *Id.* ¶¶ 60(b)-(f).

The SAC asserts that on October 7, 2019, JPMorgan learned "the substance of what Mr. Turnbull told government investigators." *Id.* ¶ 61-62.  However, the SAC still contains no allegations that Plaintiff informed JPMorgan of his answers or statements to the DOJ, or that he informed JPMorgan regarding any purported complaint he made to the DOJ.

### D.    The DOJ August 2019 Indictment.

On August 20, 2019, Christian Trunz, a former JPMorgan precious metals trader, pled guilty to participating in a spoofing conspiracy with other unidentified members of the precious metals desk between 2007 and 2016.  *See* Bouchard Decl. Ex. B (Press Release Regarding Trunz Plea).  Trunz resigned the same day as his plea.  *See* Compl. ¶ 16.  Shortly thereafter, in September 2019, the DOJ unsealed an August 22, 2019 criminal indictment against three JPMorgan traders —Michael Nowak, Gregg Smith, and Christopher Jordan—alleging that between 2008 and 2016, the defendants and multiple other traders on the JPMorgan precious metals desk engaged in a conspiracy to manipulate the precious metals futures markets by spoofing.  *See* Bouchard Decl. Ex. C (August 22, 2019 Indictment).

### E.    JPMorgan Interviews Plaintiff as Part of Its Internal Investigation and Terminates His Employment Based on Those Interviews and Its Review of Turnbull's Trades.

Following Trunz's guilty plea and the unsealing of the August 2019 indictment, JPMorgan interviewed Turnbull on three occasions in October 2019.  Compl. ¶¶ 88, 95.  The first interview took place on October 7, 2019, and lasted nearly five hours.  *Id.* ¶¶ 74.  During the interview, JPMorgan discussed with Plaintiff certain of his trading sequences; Plaintiff asserts that the interview also included a discussion of Turnbull's "knowledge of and opinions about his colleagues and the Bank's control mechanisms."  *Id.*  ¶ 75.

JPMorgan interviewed Turnbull for a second time on October 24, 2019, to discuss additional trading sequences, which were provided to Turnbull in advance of the interview to review.  *Id.*  ¶¶ 88-91.  Plaintiff asserts that the October 24 interview lasted nearly seven hours and included a review of the trading sequences provided in advance to Turnbull as well as additional trading data.  *Id.* ¶¶ 91-94.  The third and final interview occurred on October 25, 2019, by phone, and focused, according to Plaintiff, on a "subset of Mr. Turnbull's orders."  *Id.* ¶ 95.  Following

that interview, JPMorgan afforded Turnbull an opportunity to provide a "supplement [to] the existing record," which Turnbull did on October 29, 2019.  *Id.* ¶¶ 96-97.

The SAC's allegations describe thirteen total hours of interviews by JPMorgan of Turnbull over the course of three weeks.  Turnbull alleges in precise detail the trading data JPMorgan purportedly focused on and discussed during those interviews, ███████████████████

███████████████████████████  *E.g., id.* ¶¶ 67-70, 92-94.  Conspicuously absent, however, are allegations that at any time during the three interviews Turnbull was either asked about his DOJ interviews (the last of which had occurred two months prior to the internal interviews with JPMorgan) or discussed the fact or substance of his actual statements to the DOJ.

████████████████████████████████████████████████

███████████████████████████, the SAC *does not* include any allegation that Turnbull told JPMorgan what he shared with the DOJ regarding that chat.  *Id.* ¶¶ 68-70.  Instead, Turnbull pleads only that "on information and belief," JPMorgan "understood" and "believed" Plaintiff "had already disclosed to the DOJ the sum and substance of what he shared with JPMorgan during the October 7 Interview."  *Id.* ¶¶ 63, 81.

Following the internal interviews, Turnbull was placed on a leave of absence on October 31, 2019 and was terminated shortly thereafter on November 3, 2019.  *Id.* ¶¶ 98-100.  As Plaintiff admits, JPMorgan informed him that his employment was terminated "because certain of the flagged trading sequences did not meet the Bank's expectations" and because JPMorgan had lost confidence in him.  *Id.* ¶¶ 111, 114.  More specifically, "JPMorgan cited 14 [trading] instances as conduct that 'could be perceived as spoofing.'"  *Id.* ¶ 112.

### F.    The DOJ November 2019 Superseding Indictment.

In November 2019, the DOJ filed a superseding indictment in the Northern District of Illinois that, among other things, named an additional former JPMorgan salesperson as a criminal

7

defendant.  *See* Bouchard Decl. Ex. D (November 14, 2019 Superseding Indictment); Compl. ¶ 44.

The indictment also includes allegations against seven unindicted co-conspirators.  Compl. ¶¶ 44-

45, 48-53.  Of the four named defendants in the indictment, two were released from employment

prior to the indictment (one, ten years prior, and the other, two years prior).  *Id.* ¶¶ 179, 184.  The

employment of the other two defendants ended after the unsealing of the August indictment.  *Id.*

¶¶ 182-183.

## II.   THE SEPTEMBER 2020 DEFERRED PROSECUTION AGREEMENT AND UPCOMING 2022 CRIMINAL TRIALS OF INDIVIDUAL DEFENDANTS

### A.   The DPA Confirms that Plaintiff Engaged in Unlawful Trading Activity.

On September 29, 2020, the DOJ and JPMorgan entered into a Deferred Prosecution

Agreement ("DPA") that memorialized a resolution between JPMorgan and the DOJ regarding the

DOJ's precious metals investigation, including the DOJ's investigation of unlawful trading by ten

former traders on the JPMorgan precious metals desk.  *See* Bouchard Decl. Ex. E (DPA).[3]

According to the DPA, that unlawful trading resulted in at least $206 million in losses to other

precious metals futures market participants between March 2008 and August 2016.  DPA ¶ 4(a).

The DPA reflects the conclusion of both the DOJ and JPMorgan that Turnbull engaged in

unlawful trading activity.  One of the former traders referenced by the DOJ in the DPA is "Trader

3," whom the DPA describes as an individual who joined JPMorgan in 2005 and was a Managing

Director and the Global Head of Precious Metals Trading at the time of his departure from

---

[3] This Court can take judicial notice of the DPA, which was publicly filed in *USA v. JPMorgan Chase & Co.*, No. 20-cr-00175, ECF No. 2 (D. Conn. 2020), along with the public plea agreements, indictments, and court filings referenced herein – all of which directly regard the DOJ's investigation of JPMorgan's precious metals desk, the catalyst of Turnbull's entire claim for retaliation.  *See* Order at 3-4, 8 (citing *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-cv-2106, 2017 WL 1169629, at *1 n.2 (S.D.N.Y. Mar. 28, 2017)).

JPMorgan in October 2019.  DPA Statement of Facts ("SOF") ¶ 15.  It is beyond dispute that Trader 3 is Turnbull, as confirmed by the SAC's own allegations regarding Turnbull's employment history at JPMorgan.  *See* Compl. ¶¶ 26, 29 (describing Plaintiff's employment history); Order at 8 ("The description plainly describes the plaintiff.").

As set forth in the DPA, Turnbull and the other former traders referenced "engaged in a scheme to defraud" by "knowingly and intentionally plac[ing] orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution ('Deceptive PM Orders'), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts."  DPA SOF ¶¶ 18, 19.

As to Turnbull specifically, the DPA is unambiguous:  "**Trader 3 also engaged in unlawful trading activity involving Deceptive PM Orders.**"  *Id.* ¶ 43.  The DPA describes one example of Trader 3's unlawful trading activity in detail:

> For example, on August 14, 2013, at 1:16:15.341 p.m., Trader 3 placed a Genuine PM Order to sell one palladium futures contract at $739.00.  Then, 55.860 seconds later, at 1:17:11.201 p.m., Trader 3 placed a Deceptive PM Order to buy 50 contracts at $738.75 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Two milliseconds later, Trader 3's Genuine PM Order was filled.  Next, 2.686 seconds later, at 1:17:13.889 p.m., Trader 3 canceled his Deceptive PM Order in its entirety.

*Id.*

## B.    The DPA Also Confirms JPMorgan's Cooperation with the DOJ.

The DPA also demonstrates that the DOJ credited JPMorgan for its cooperation with the DOJ's investigation.  In fact, rather than penalizing JPMorgan for terminating Turnbull's employment in October 2019, the DOJ partially credited JPMorgan for terminating—as part of JPMorgan's good-faith remediation efforts—the employment of individuals who were involved in the trading misconduct described therein.  DPA ¶ 4(d); *see also* ¶ 4(c) ("The Company received

credit for its cooperation . . . including conducting a thorough internal investigation [and] proactively identifying [to the DOJ] important documents and information **even when those documents and information were not favorable to the Company** . . . .") (emphasis added).[4] The DPA also notes that JPMorgan provided to the DOJ "all relevant facts known to [the Company], including information about the individuals involved in the conduct described in the . . . Statement of Facts and conduct disclosed to [the DOJ] prior to the Agreement." *Id.* ¶ 4(e). As part of its internal investigation, JPMorgan reviewed Turnbull's trading activity, and made the decision to terminate his employment based on its determination that certain of Turnbull's trading activity did not meet JPMorgan's expectations. *See* Compl. ¶¶ 111-12, 114.

### C.   Turnbull Has Been Named As a Co-Conspirator in the Upcoming Criminal Smith Trial.

The criminal trials of the four defendants named in the Superseding Indictment are scheduled to begin in July and November 2022. *United States v. Smith, et al.*, 19-cr-00669 (N.D. Ill.). On July 9, 2021, the parties in that matter filed motions in limine regarding evidence proposed to be introduced at trial. The evidentiary motions filed by the DOJ refer to Turnbull by name and identify him as **a co-conspirator** with the criminal defendants. The DOJ's papers also set forth in detail communications and facts involving Turnbull, including communications by Turnbull described as furthering the conspiracy alleged in the criminal case. *See, e.g.*, DOJ's Motion for Preliminary Admission of Co-Conspirator Statements (Bouchard Decl. Ex. F at 86–88) (describing

---

[4] For example, the DPA prominently and favorably discusses JPMorgan's "systematic effort to reassess and enhance [its] market conduct compliance program and internal controls" following a 2015 consent order, including by hiring hundreds of new compliance officers and spending over $335 million on personnel and other compliance costs, improving anti-fraud and manipulation training and policies, revising trade and electronic communications surveillance programs, and implementing tools and processes to facilitate closer supervision of traders. DPA ¶ 4(g).

in detail a chat between Turnbull and Edmonds, which "furthered the conspiracy by describing the method of the criminality and by helping to conduct the business of the scheme"); DOJ's Motion to Preclude Impermissible Character Evidence (Bouchard Decl. Ex. G at 6) (referring to **"co-conspirator Donald Turnbull"**); DOJ's Motion to Admit Evidence of Defendants' Compensation (Bouchard Decl. Ex. H at 2–3) (citing to Turnbull's total compensation of $12.7 million between 2008–2016 as "highly probative of motive and intent for Defendants and their co-conspirators . . . and provided strong incentives for Defendants and their co-conspirators to keep their jobs . . . by generating profits for JPMorgan, which they maximized through fraudulent and manipulative trading practices and misstatements during inquiries into their trading activity").

## III.    PLAINTIFF'S CLAIMS AND THE SECOND AMENDED COMPLAINT

Plaintiff now seeks to state a claim for retaliation under SOX based on the fact that he participated in three DOJ interviews, the first of which was seven months prior, and the last of which was two months prior, to his termination. *See* Compl. ¶¶ 54, 99-101, 199. As compared to the FAC – which was properly dismissed – the SAC adds allegations regarding the purported (i) content of Plaintiff's confidential DOJ interviews (*id.* ¶¶ 55-59); (ii) ███████████████ ████████████████████████ (*id.* ¶¶ 67-70); and (iii) documents and trading data produced by JPMorgan to the DOJ as part of JPMorgan's cooperation with the DOJ's investigation of JPMorgan's precious metals trading desk (*id.* ¶¶ 114-135).

The SAC **does not add** allegations (i) asserting that JPMorgan questioned Plaintiff regarding his DOJ interviews or considered those interviews when terminating his employment; (ii) reflecting that JPMorgan had knowledge of any purported complaints of illegal activity by Plaintiff to the DOJ; or (iii) demonstrating how it is plausible that JPMorgan would terminate Plaintiff for cooperating with the DOJ in the middle of a DOJ investigation of JPMorgan and when JPMorgan was itself cooperating. The deficiency of Plaintiff's allegations is further apparent in

light of the DPA's confirmation that Turnbull, a co-conspirator, engaged in unlawful trading activity. For these reasons, the SAC includes "no plausible allegation that it was the plaintiff's cooperation with the Government that was a contributing factor in his termination" and does not permit "the implausible inference that retaliation was a contributing factor in the plaintiff's terminations." Order at 15.

## LEGAL STANDARD

The purpose of Rule 12(b)(6) is to "streamline[] litigation by dispensing with needless discovery and factfinding" and eliminating baseless claims. *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989). Thus, where "allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal citations omitted). To avoid dismissal, Plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard requires that plaintiff show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## **ARGUMENT**

I.   **PLAINTIFF HAS NOT PLAUSIBLY ALLEGED THAT HIS PURPORTED PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR IN HIS TERMINATION, AND THUS FAILS TO STATE A PRIMA FACIE CLAIM UNDER SOX.**

To receive whistleblower protection under SOX, a plaintiff must plead a prima facie case that (1) he engaged in protected activity; (2) the employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.  *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 589 (S.D.N.Y. 2019) (Koeltl, J.) (dismissing SOX claim).  If the employee establishes these elements, the employer may avoid liability if it establishes by clear and convincing evidence that it would have taken the same unfavorable action in the absence of that protected behavior.  *Id.* (citing *Bechtel v. Admin. Rev. Bd., U.S. Dep't of Labor*, 710 F.3d 443, 447 (2d Cir. 2013)).

### A.   **Plaintiff Fails to Plead a Causal Connection Between His DOJ Interviews and His Termination.**

Plaintiff fails to meet his threshold burden because he has not sufficiently alleged that his purported protected activity (his DOJ interviews) were a contributing factor in his termination. Even assuming, arguendo, that Plaintiff's DOJ interviews constitute protected activity pursuant to 18 U.S.C. 1514(a)(2), as pled, and accepting as true Plaintiff's allegation that JPMorgan knew of the fact of Plaintiff's DOJ interviews, the SAC still fails to state a claim because it does not plead any facts or circumstances to suggest that JPMorgan had a retaliatory motive to terminate him for his participation in the same DOJ interviews that JPMorgan helped to facilitate.

Specifically, the SAC does not point to any alleged statements or actions by JPMorgan indicating that it considered Turnbull's DOJ interviews in reaching its termination decision.  *See* Order at 12.  Moreover, although the SAC adds allegations purporting to characterize Turnbull's confidential statements to the DOJ, it still fails to allege that Turnbull communicated the substance

13

of those purported statements to JPMorgan.  Instead, the SAC continues to be based entirely on sleight of hand: Plaintiff asks for an inference that JPMorgan had knowledge of the substance of his purported statements to the DOJ (and terminated him for those statements), but, in support, offers only conclusory allegations that JPMorgan "learned" the substance of those assertedly "damaging" statements on October 7, 2019 without any allegations regarding *how* JPMorgan purportedly "learned" that information on October 7, 2019 or otherwise.  *See* Compl. ¶¶ 2, 62, 78, 79, 86, 139, 197.  The Court should not allow such unsupported inferences.  *See Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006) (dismissing SOX claim "barren of any allegations of conduct that would alert Defendants that [Plaintiff] believed the company was violating any federal rule or law related to fraud on shareholders"); *Tonra*, 405 F. Supp. 3d at 589–91 (Koeltl, J.) (granting motion to dismiss SOX claim where plaintiff failed to plead adequately that he complained of a violation of a relevant securities law); *see also Cellucci v. O'Leary*, No. 19-cv-2752, 2020 WL 977986, at *10–11 (S.D.N.Y. Feb. 28, 2020) (dismissing whistleblower retaliation claim under the Dodd-Frank Act for failure to "plausibly plead any facts from which the Court can infer that Defendants knew about the SEC complaint" and declining to award Plaintiffs the "infer[ence] that [the] report to the SEC encompassed every allegedly improper communication or omission cited in the amended complaint").

## B.   Allegations Upon "Information and Belief" Are Insufficient to Meet Plaintiff's Burden to Show His DOJ Interviews Contributed to His Termination.

The SAC continues to rely exclusively on allegations made upon "information and belief" to establish a causal connection between his DOJ interviews and his termination and offers only speculation regarding what JPMorgan must have "believed" or "understood" regarding Plaintiff's DOJ interviews after October 7, 2019.  *See* Compl. ¶¶ 63, 80-83, 113.  Allegations regarding causation must be based on more than conclusory allegations unsupported by facts, however.

14

"[U]nwarranted deductions of fact," presented as true are insufficient, and the plaintiff "must provide more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *Brown v. Colonial Sav. F.A.*, No. 16-cv-0884, 2017 WL 354246, at *3 (N.D. Tex. Jan. 23, 2017); *see also Egan v. TradingScreen, Inc.*, No. 10-cv-8202, 2011 WL 4344067, at *3 (S.D.N.Y. Sept. 12, 2011) (dismissing whistleblower claim under the Dodd-Frank Act because plaintiff's amended complaint "failed to allege that an individual or entity actually reported [defendant's] conduct to the SEC. . . . [f]ar from remedying the inadequacies of the [complaint], this pleading recapitulates them, by alleging transmission to the SEC 'on information and belief' without facts that establish a basis for this belief"); *Rimini v. JP Morgan Sec. LLC*, No. 18-cv-1031, 2018 WL 11229124, at *2 (1st Cir. Nov. 7, 2018) (affirming the dismissal of a SOX whistleblower claim because "[Plaintiff's] conclusory allegation that he engaged in SOX-related whistleblowing, unsupported by any facts describing what he did, is inadequate under any pleading standard to establish that he engaged in protected activity") (internal quotation omitted).  Plaintiff's "information and belief" allegations must therefore be disregarded and afforded no weight.[5]  The SAC does not include any allegations that JPMorgan knew Turnbull was, in fact, a

---

[5] The fact that Plaintiff brings his SOX claim under 18 U.S.C. § 1514A(a)(2) rather than § 1514A(a)(1), does not obviate the need for Plaintiff to establish causation.  "Indeed, causation is an integral aspect of a claim for retaliation." Order at 12.  Under (a)(2), even assuming that his mere participation in an interview with the DOJ is protected activity, Plaintiff still must establish causation between that activity and the termination decision.  Turnbull fails to do so.  It is also apparent that he did not plead under (a)(1) because he could not truthfully allege that he in fact complained about a violation of relevant laws or put forth a single communication that would evidence his reasonable belief of a violation of relevant securities laws.  Moreover, if Turnbull believed he had been terminated because he participated in interviews with the DOJ, he could certainly have a raised a contemporaneous internal complaint in that regard.  He did not.

"whistleblower" protected by SOX, and "allege[s] no facts that would support an inference that his participation in the DOJ investigation was a contributing factor in his termination."  Order at 12.

### C.    The Passage of Time Between Plaintiff's DOJ Interviews and His Termination Does Not Support an Inference of Retaliation.

The SAC fails to establish a temporal connection between Plaintiff's alleged protected activity – his DOJ interviews, which began in March 2019 – and his termination in November of that year.  Although the SAC points to the twenty-four day period between Plaintiff's October 7, 2019 interview and his termination, the SAC itself includes allegations that JPMorgan knew about Plaintiff's DOJ interviews **eight months earlier** in March 2019.  Compl. ¶ 60(a)-(f) ("Mr. Turnbull **had cooperated** with the DOJ's investigation by participating in meetings with government investigators, which JPMorgan **first learned in March 2019**.") (emphasis added).  "Between [March 2019] and the plaintiff's termination, almost eight months passed.  That is too long a delay to permit an inference of retaliation."  Order at 13-14 (citing cases).

## II.    PLAINTIFF'S CLAIM THAT HE WAS TERMINATED FOR PARTICIPATION IN A DOJ INVESTIGATION THAT JPMORGAN ITSELF COOPERATED WITH IS FACIALLY IMPLAUSIBLE.

### A.    JPMorgan Did Not Retaliate Against a Cooperating Witness.

In light of the DPA's determination that Turnbull engaged in unlawful trading activity and the identification of Turnbull as a co-conspirator by the DOJ, Turnbull's allegation that he was terminated for his DOJ interviews is not only wrong, it is not plausible.  Order at 14-15; *see also* DPA SOF ¶ 43.  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft*, 556 U.S. at 678.  Here, the DPA confirms that JPMorgan received partial credit from the DOJ for terminating employees, including Turnbull, who were involved in the trading misconduct described.  DPA ¶ 4(d).

With that context, Turnbull's purported theory that JPMorgan terminated him in 2019—in the midst of the DOJ's ongoing investigation of JPMorgan's precious metals desk—because Turnbull was cooperating with the DOJ is entirely implausible.  If Turnbull was in fact cooperating with the DOJ, the DOJ certainly would have taken action *against* JPMorgan for terminating his employment in retaliation for cooperation, rather than *crediting* JPMorgan for its cooperation with the DOJ's investigation, including its employment actions against those traders who engaged in criminal conduct.  DPA ¶ 4(c)–(d); Order at 15 ("Firing a cooperating employee because the employee was also cooperating would be **extremely counterproductive**.") (emphasis added).  When deciding a motion to dismiss, "the Court is not obligated to suspend its common sense."  Order at 15 (citing *AJ Energy LLC v. Woori Bank*, 829 F. App'x 533, 534 (2d Cir. 2009) (affirming dismissal of complaint where it was "highly implausible that, after having three billion euros stolen by [defendant], [plaintiff] then arranged for another five billion euros to be transferred to the same bank, only to have the funds again stolen by it"); *see also Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless' – that is, if they are 'fanciful,' 'fantastic,' or 'delusional.') (citations omitted); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (quotation and citations omitted).  The SAC asserts that JPMorgan terminated Plaintiff in order to "eliminate" and "neutralize" "the risk Mr. Turnbull represented."  Compl. ¶¶ 83-84.  Plainly, terminating a cooperating witness would have had the opposite effect.

Turnbull's claim that he was terminated for his DOJ cooperation rather than his trading activity and failure to meet expectations is unsupported by facts, and the conspiracy theories he

seeks to advance are insufficient to push the SAC across the threshold from conceivable to plausible. *Twombly*, 550 U.S. at 570. Turnbull's misconduct is apparent both from the DPA, as well as the DOJ's identification of Turnbull as a co-conspirator in the *Smith, et al.* case. "[T]he plaintiff's own allegations made it clear that JPMorgan examined the plaintiff's own activities and found them questionable and those activities formed part of JPMorgan's DPA." Order at 15.

The SAC unsuccessfully attempts to diminish the impact of these facts by alleging – again, only on "information and belief" – that following Plaintiff's termination, JPMorgan "provide[d] false evidence to the DOJ" in the form of a purported "mistranscription" of a recording reflecting communications between Plaintiff and another trader regarding an August 14, 2013 trade. Compl. IV.C., ¶ 116, 129-30. These allegations are implausible on their face. First, even assuming that the recording at issue was "mistranscribed" (it was not), the SAC admits that **both** the original recording as well as the transcription were provided to the DOJ, both of which the DOJ could evaluate for itself. *Id.* ¶ 129. Second, Turnbull's inclusion in the DPA and identification by the DOJ as a co-conspirator in the *Smith, et al.* case followed independent review by the DOJ of evidence regarding Plaintiff's trading, including his trading data, electronic communications, Plaintiff's own DOJ interviews, and DOJ interviews of other witnesses including at least two cooperating witnesses who had pled guilty. Plaintiff's conspiratorial allegation that the DOJ was somehow duped by JPMorgan into naming Turnbull in the DPA and as a co-conspirator – based entirely on "information and belief assertions" regarding one transcription that Plaintiff himself describes as "difficult to decipher" (Compl. ¶ 119(e)) – does nothing to advance his claim that he was terminated for his DOJ interviews. Turnbull was terminated because JPMorgan determined that his trades could be perceived as manipulating the market (Compl. ¶ 112), not because he participated in a DOJ investigation regarding illegal market manipulation. "There is no plausible

allegation that it was the plaintiff's cooperation with the Government that was a contributing factor in his termination.  All of the plaintiff's allegations as to JPMorgan's motivation for his termination are completely conclusory and implausible."  Order at 15.[6]

**B.    Turnbull's Allegations That JPMorgan's Termination Reason Was Pretextual Are Also Wrong and Implausible.**

JPMorgan terminated Turnbull's employment in October 2019 and informed him that certain of the "flagged trading sequences did not meet the Bank's expectations," resulting in a loss of confidence.  Compl. ¶¶ 111, 114.  In particular, JPMorgan "cited 14 [trading] instances . . . as conduct that 'could be perceived as spoofing.'"  Compl. ¶ 112.  Turnbull further asserts, however, that after his October 7, 2019 internal interview, JPMorgan then "*hurried* through a faux inquiry into Mr. Turnbull's unimpeachable trading practices."  Compl. ¶¶ 12 (emphasis added); 88.  That "faux inquiry" focused on trades that Turnbull repeatedly alleges were "flagged" by JPMorgan during and after Turnbull's internal interviews in the Bank's purported rush to retaliate against Turnbull for his participation in DOJ interviews months earlier.  Compl. ¶¶ 75, 89, 91, 111, 147, 153, 162, 164.  This is incorrect.

Plaintiff's allegations are also implausible.  Investigation of Turnbull's trades began well before October 7, 2019, and in fact as early as April 2019.  *See* Bouchard Decl. Ex. I (April 11, 2019 Email from Turnbull's counsel at Simpson Thacher to JPMorgan's counsel at Sullivan & Cromwell setting forth fourteen of Turnbull's precious metals trades between October 26, 2009 and October 9, 2013).[7]  Turnbull, through his counsel, was well aware that his trades were under

---

[6] The DOJ's identification of Turnbull as a co-conspirator in Court submissions also contradicts his allegation that he is not an unindicted co-conspirator.  *E.g.*, Compl. ¶¶ 65.

[7] In deciding a motion to dismiss, a court may consider extrinsic documents not attached to the complaint if they are incorporated into the complaint by reference or integral to the complaint.  *E.g.*, *Roth v. Jennings*, 489 F.3d 499, 509

review well before his October 2019 DOJ interviews, and well before the filing of his Complaint here. Not coincidentally, the August 14, 2013 palladium trade identified in the DPA as an example of Turnbull's unlawful trading activity is one of the fourteen trades identified by Turnbull's counsel in April 2019—the month following Turnbull's first DOJ interview. *See supra* 8-9 (DPA SOF ¶ 43); Compl. ¶ 54 (alleging March 2019 DOJ interview date). A review of Turnbull's trades was underway by April 2019, and not only by JPMorgan. Plaintiff's allegation that JPMorgan instigated and rushed a review of his trades after his October 7, 2019 internal interview is thus factually implausible and demonstrates that Plaintiff's claim of retaliation falls of its own weight.[8]

---

(2d Cir. 2007). The April 2019 email is integral to the Amended Complaint because Turnbull's case is premised on his allegation that after the October 7 interview with JPMorgan, *JPMorgan* initiated and identified fourteen trades that had never been previously discussed as potentially problematic and were now used as the pretextual justification for his termination. *See, e.g.*, Compl. ¶¶ 12, 75, 89, 91, 111, 112, 147, 153, 162, 164. Turnbull knew, through counsel, of the existence of this email and the fact that his trades were under investigation well before October 2019 (and before the filing of the initial Complaint here). As a result, this email renders Turnbull's theory of his claim a factual impossibility. *See Tonra*, 405 F. Supp. 3d at 587–88, 590 (dismissing SOX claim because extrinsic emails attached to defendants' motion to dismiss showing plaintiff's knowledge that disclosure of drug study findings was not necessary "undermine[d]" plaintiff's allegation of reasonable belief that defendants violated securities law for failure to disclose study's results); *Houlahan v. Raptor Trading Sys., Inc.*, No. 16-cv-9620, 2018 WL 3231662, at *4 (S.D.N.Y. Feb. 12, 2018) (dismissing plaintiff's claims upon consideration of a letter not attached to the complaint because plaintiff was aware of the letter, the letter addressed a corporate acquisition at the heart of plaintiff's claims, and the letter "provide[d] part of the factual premise for Plaintiff's good faith and fair dealing claim[,]" such that the letter was integral to the complaint).

[8] The SAC allegations regarding Plaintiff's theories as to why the August 14, 2013 trade identified in the DPA is not "inculpatory" (*E.g.*, Compl. ¶ 119(a)-(e)) may or may not have bearing on the question of whether Plaintiff is criminally culpable for his trades. They have no relevance, however, to the question before this Court of whether

### III.   ALLOWING PLAINTIFF TO AMEND THE COMPLAINT  A THIRD TIME WOULD BE FUTILE.

Turnbull has amended his Complaint twice, including once after dismissal of the FAC on the basis that his allegations regarding SOX retaliation were implausible.  The SAC still fails to plausibly plead that Plaintiff's DOJ interviews were a contributing factor in his termination. "Where it appears that granting leave to amend would be futile or is unlikely to be productive, it is not an abuse of discretion to deny leave to amend."  *Charter Commc'ns., Inc. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 338 F. Supp. 3d 242, 255 (S.D.N.Y. 2018); *Douramanis v. Dur-Am. Brokerage Inc.*, No. 20-cv-5825, 2021 WL 961761, at *2 (S.D.N.Y. Mar. 15, 2021) ("A proposed amended pleading is futile when it fails to state a claim.") (quotation and citation omitted).

Turnbull's claims are futile because JPMorgan would have justifiably terminated Turnbull regardless of his participation in the DOJ's investigation; the DPA's findings that Turnbull himself engaged in unlawful trading activity and his identification as a co-conspirator compel that conclusion.  *See, e.g.*, *Charter Commc'ns., Inc.*, 338 F. Supp. 3d at 248 n.3 (considering documents that may be judicially noticed under Rule 12(b)(6) in determining the question of futility).[9]

---

Plaintiff has plausibly alleged he was terminated for his participation in DOJ interviews.  He has not done so because he has not plausibly pled the basic elements of a SOX retaliation claim.

[9] *See also Bechtel*, 710 F.3d at 451 (employer can rebut prima facie case with clear and convincing evidence that it would have taken the same adverse action in the absence of protected behavior).  Courts regularly find that behavior far less grave than committing illegal activity in the course of one's employment is sufficient to meet an employer's burden that it would have terminated an employee regardless of protected activity.  *See, e.g.*, *Guitron v. Wells Fargo Bank, N.A.*, 619 F. App'x 590, 591 (9th Cir. 2015) (failure to meet quarterly sales goals; insubordination to manager; refusal to return to work); *Kim v. Boeing Co.*, 487 F. App'x 356, 357 (9th Cir. 2012) (insubordination); *Hemphill v. Celanese Corp.*, 430 F. App'x 341, 345 (5th Cir. 2011) (single incident of yelling at secretary); *Wallace v. Tesoro*

Regardless of his participation in the DOJ interviews, Turnbull cannot amend away his unlawful activity, and cannot overcome or rebut that JPMorgan would have terminated Turnbull after its own internal investigation found that Turnbull's conduct did not meet JPMorgan's expectations. Put simply, Turnbull cannot allege any set of facts that would plausibly suggest the fact of his DOJ interviews was a contributing factor to his termination in light of his own unlawful trading activity and JPMorgan's own cooperating status at the time of Turnbull's termination. As a result, his claim is not viable and amendment of the Complaint again would be futile.

## CONCLUSION

JPMorgan respectfully requests that the Court grant its motion to dismiss the SAC with prejudice and deny any request by Plaintiff to amend his Complaint again.

Dated:  New York, New York
      April 21, 2022

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:  /s/ Sarah E. Bouchard
    Sarah E. Bouchard (*pro hac vice*)
    MORGAN, LEWIS & BOCKIUS LLP
    1701 Market Street
    Philadelphia, Pennsylvania 19103
    Tel:  (215) 963-5000
    Fax:  (215) 963-5001

    Gina F. McGuire
    101 Park Avenue
    New York, New York 10178
    Tel:  (212) 309-6000
    Fax:  (212) 309-6001

---

*Corp.*, No. 11-cv-0099, 2017 WL 6403117, at *7 (W.D. Tex. Fed. 23, 2017) (disrespect for subordinates, peers, and management; refusal to work with others; micromanaging behavior; display of favoritism); *Wallender v. Canadian Nat'l Ry. Co.*, No. 13-cv-2603, 2015 WL 10818741, at *25–27 (W.D. Tenn. Feb. 10, 2015) (insubordination and misreporting of data).

*Attorneys for Defendant*
*JPMorgan Chase & Co.*

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I HEREBY CERTIFY that on this 21st day of April, 2022, a copy of the Notice of Defendant JPMorgan & Chase Co.'s Motion to Dismiss the Complaint, accompanying Memorandum of Law in Support of Defendant's Motion, and Declaration of Sarah E. Bouchard were electronically filed through the Court's ECF filing system and served via ECF upon all parties and counsel of record.

I also certify that this brief contains 7,000 words (excluding those in the cover page, certification of compliance, Table of Contents, and Table of Authorities) and that it complies with all applicable formatting rules.

 */s/ Sarah E. Bouchard*
Sarah E. Bouchard