UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD TURNBULL,

                          **Plaintiff,**

       - against -

JPMORGAN CHASE & CO.,

                        **Defendant.**

21-cv-3217 (JGK)

MEMORANDUM OPINION
AND ORDER

**JOHN G. KOELTL, District Judge:**

The plaintiff, Donald Turnbull, brought this action against the defendant, JPMorgan Chase & Co. ("JPMorgan"), alleging retaliation in violation of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(a)(2). The Court previously dismissed without prejudice the plaintiff's first amended complaint, ECF No. 21, for failure to state a claim. Turnbull v. JPMorgan Chase & Co., No. 21-cv-3217, 2022 WL 608708 (S.D.N.Y. Feb. 24, 2022). The plaintiff has now filed a Second Amended Complaint (the "Complaint"), ECF No. 41.

The defendant now moves to dismiss the second amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the defendant's motion to dismiss is **denied.**

## I.

The following facts are taken from the Complaint, except as noted.[1] The factual allegations are taken as true for purposes of this motion to dismiss. Turnbull joined JPMorgan's precious metals trading desk in 2005. Compl. ¶ 26. Turnbull was an effective and respected member of the department and earned several promotions, culminating in his 2018 promotion to Managing Director of the desk. Id. ¶ 27-30. Performance reviews deemed Turnbull "one of the most diligent and controlled traders . . . exceptional at both managing risk and communicating a balanced view of these risks to senior management." Id. ¶ 30.

In 2018, the Department of Justice ("DOJ") began investigating the JPMorgan precious metals desk for "spoofing." Id. ¶ 32. Spoofing is the illegal practice of placing orders for trades with the intention of canceling those orders before execution, creating the illusion of supply or demand, in order to cause prices to shift and then to trade on those shifted prices. See id. ¶¶ 34-35, 39-41.

In 2011, the Anti-Disruptive Practices Authority of the Dodd-Frank Act became effective. Since then, "regulators and federal prosecutors began to crack down on alleged spoofing

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

activity." Id. ¶ 42. In 2013, the CME, the primary exchange on which precious metals futures are traded, began investigating JPMorgan's precious metals desk for alleged spoofing. Id. At least one trader was suspended as a result of this investigation. Id.

The DOJ later began investigating similar conduct and issued indictments in August and November of 2019 against several JPMorgan employees. Id. ¶ 43-46.[2] Turnbull was not among those indicted. Id. ¶ 46-47. Turnbull "cooperated fully" with the DOJ investigation, including by "sp[eaking] with investigators at length during three meetings between March and August 2019, [and] truthfully answering every question investigators asked." Id. ¶ 54. In those interviews, the

---

[2] On August 20, 2019, a JPMorgan precious metals trader pleaded guilty to participating in a spoofing conspiracy. The Court takes judicial notice of the guilty plea as a public record. See, e.g., Wims v. N.Y.C. Police Dep't, No. 10-cv-6128, 2011 WL 2946369, at *3 n.2 (S.D.N.Y. July 20, 2011). In September 2019, the DOJ unsealed an indictment against three traders on JPMorgan's precious metals desk on spoofing-related charges. The Court takes judicial notice of the August 22, 2019 indictment (the "Smith Indictment") and other filings made in United States v. Smith, No. 19-cr-669 (N.D. Ill. filed Aug. 22, 2019), as public records. See, e.g., Blount v. Moccia, No. 16-cv-4505, 2017 WL 5634680, at *2 n.5 (S.D.N.Y. Nov. 21, 2017). The Court takes judicial notice of these records not for the truth of the allegations therein, but for the existence of the documents, the existence of the allegations, and, in the case of the Smith Indictment, the fact of its unsealing in September 2019. See Deaton v. Napoli, No. 17-cv-4592, 2019 WL 4736722, at *7 n.5 (E.D.N.Y. Sept. 27, 2019) ("The Court views these documents solely to observe the existence of the allegations made therein, not for the truth of the matters asserted.").

plaintiff told the DOJ that JPMorgan began anti-spoofing training three years after Congress outlawed spoofing and Turnbull raised concerns regarding the trading conduct of "Trader A," "Trader B," and "Trader C," all of whom the plaintiff believed were spoofing. Id. ¶ 55a-55h. The plaintiff alleges that the CME or CFTC later investigated Trader B for spoofing. Id. ¶ 55e. When shown instances of trading conduct between Traders B and C, the plaintiff told the DOJ that "[s]ome of the order placements and cancellations occurred too fast for a trader to have had time to think, and . . . looked like it could be spoofing" and that "JPMorgan Compliance was aware of" these particular instances of trading conduct between Traders B and C. Id. ¶ 58a-58c. The plaintiff further told the DOJ that a precious metals supervisor called a trader who pleaded guilty to spoofing "an idiot," that after discussing the FBI's attempts to interview three precious metal traders with a compliance officer, the officer referred to the investigators as "idiots," and that Turnbull's manager was informed by a more senior individual of Turnbull's meeting with the DOJ. Id. ¶ 59a-59d.

Turnbull alleges that after his interviews with the DOJ ended in August 2019, JPMorgan knew only that Turnbull had cooperated with the DOJ investigation by meeting with the DOJ on three occasions, that these interviews were "related to [the] ongoing investigations," and that the interviews "included

questions about JPMorgan's compliance program and the culture and trading practices on its precious metal desk." Id. ¶ 60a-60f. The plaintiff alleges that, at that time, JPMorgan did not know "the substance of what [the plaintiff] told government investigators during his three interviews." Id. ¶¶ 61, 71.

On October 7, 2019, JPMorgan interviewed Turnbull ostensibly to discuss a handful of trading sequences "flagged" for spoofing, but most of the discussion "focused on [the plaintiff's] knowledge of and opinions about his colleagues and the Bank's control mechanisms." Id. ¶ 75. The interview was scheduled to last for 2.5 hours but ran for nearly 5 hours. Id. ¶ 74. During the interview, the plaintiff told the defendant "for the first time" substantially similar information that he had communicated to the DOJ during his earlier interviews. See id. ¶ 67a-67u (alleging specifically what information the plaintiff told JPMorgan during the October 7 interview). During the interview, Turnbull also told JPMorgan his views on whether Trader D had committed misconduct, and informed JPMorgan investigators that these views were influenced by an electronic chat transcript shown to him during his interviews with the DOJ. Id. ¶ 68-70.

Turnbull alleges that, after the October 7 interview, the defendant "learned, for the first time, that Mr. Turnbull had presented information to the DOJ that documented severe, chronic

institutional failures of JPMorgan's training policies, monitoring of market manipulation on the precious metals desk, and its discipline of traders who engaged in potential misconduct, as well as critical and damaging information regarding JPMorgan's training and compliance program on spoofing." Id. ¶ 79. Turnbull further alleges that "on information and belief, beginning on October 7, 2019, JPMorgan understood that Mr. Turnbull had already disclosed to the DOJ the sum and substance of what he shared with JPMorgan during the October 7 Interview." Id. ¶ 81. Before the October 7 interview, the plaintiff alleges that JPMorgan "thought of Mr. Turnbull as an employee who would 'toe the line' in support of the Bank's defensive position: that it had not condoned the trading conduct under federal investigation and, in any event, had insufficient knowledge of that conduct to warrant criminal penalties," id. ¶ 77, but after October 7 the defendant "viewed [the plaintiff's] cooperation with DOJ as a dangerous threat to the non-prosecution bargain the Bank was trying to strike with government prosecutors." Id. ¶ 82.

On October 18, JPMorgan informed the plaintiff that it "wanted to discuss additional trading sequences," including those reviewed in the October 7 meeting, on October 24. Id. ¶ 88. On October 21, JPMorgan told Turnbull he would be "walk[ing] through" the flagged sequences in detail during the

October 24 meeting. Id. ¶ 89. On October 23, "JPMorgan flagged

an additional subset of order sequences for discussion." Id.

¶ 91.

   The October 24 meeting lasted 7 hours, rather than the

scheduled 3 hours. Id. ¶ 92. During the meeting, the defendant

introduced certain data that Turnbull had not been provided

before the meeting. Id. The plaintiff alleges that the

introduced data "could not support inferences of misconduct,"

was "decontextualized from other relevant market and positional

information," was "flawed and internally inconsistent," and

"incorporated trades completed by individuals who had been

indicted or alleged as co-conspirators and whose conduct had

nothing to do with [Turnbull]." Id. ¶¶ 93-94. The defendant

"brushed [the] data aside" when Turnbull questioned its

conflation of other traders' data with his own. Id. ¶ 94. The

meeting resumed the next day, October 25, for an additional

hour. Id. ¶ 95. On October 29, with permission from the

defendant, Turnbull supplemented the record with an affirmative

defense of his trading conduct. Id. ¶ 97.

   On October 31, Turnbull learned that he had been placed on

leave. Id. ¶ 98. On November 3, Turnbull saw an email from his

supervisor, mistakenly sent to him, stating that there would be

a call to "brief the participants on [the plaintiff's] departure

from the Firm and [another employee's] new role as the head of

Precious Metals Trading." Id. ¶ 100. Until November 3, JPMorgan had not yet informed Turnbull of his termination.

The plaintiff concedes that JPMorgan "claimed it terminated [the plaintiff] because certain of the flagged trading sequences did not meet the Bank's expectations." Id. ¶ 111. After reviewing 53,000 orders over a nine-and-a-half-year period, the defendant cited 14 instances as "conduct that could be perceived as spoofing" as the basis for the plaintiff's termination. Id. ¶ 112. The plaintiff alleges that JPMorgan terminated him because "management feared the information [he] possessed and previously provided to the DOJ, the views he expressed, and the threat these posed to [JPMorgan's] reputation and defense," and "because [Turnbull] disclosed damaging information to the DOJ, JPMorgan falsely claimed a loss of confidence in [Turnbull] to justify his termination." Id. ¶¶ 113-114.

JPMorgan continued investigating Turnbull's trading conduct after his termination. After reviewing 1.9 million e-communications and audio recordings by Turnbull, JPMorgan identified one conversation as "confirming" its suspicions of spoofing regarding a trade Turnbull made on August 14, 2013. Id. ¶ 117. Turnbull alleges that the conversation was not inculpatory. Turnbull alleges further that JPMorgan communicated this information to the DOJ in order to "undermine Mr. Turnbull's credibility, thereby reducing [JPMorgan's] potential

institutional culpability," even though JPMorgan allegedly knew
that Turnbull was not among the co-conspirators named in the DOJ
indictments. Id. ¶ 130-132. Turnbull alleges that JPMorgan did
so in order to "inculpate [the plaintiff] in the alleged
spoofing conspiracy." Id. ¶ 134.

Turnbull alleges that his participation in the DOJ's
investigation of JPMorgan contributed to his termination.
Specifically, Turnbull alleges that, after the October 7
interview, JPMorgan learned "the nature" of Turnbull's
participation in the DOJ investigation — "specifically, his
disclosure to the DOJ of information about JPMorgan's serious
institutional failures to provide proper guidance, surveillance,
and enforcement on trading conduct" — and that these "harmful"
disclosures were a contributing factor to his termination on
October 31. Id. ¶¶ 138, 142. JPMorgan terminated Turnbull just
24 days after the October 7 interview. Id. ¶ 139.

The plaintiff alleges that JPMorgan's proffered reason for
his termination was pretextual. The defendant purportedly
terminated Turnbull for "trading in a manner that might look
like spoofing." Id. ¶ 143. In July 2020, nine months after the
plaintiff was terminated, JPMorgan flagged 14 trading sequences
by Turnbull's as "conduct that could be perceived as spoofing."
Id. ¶ 145. The plaintiff alleges for comparison that two other
traders were indicted by the DOJ for spoofing by placing

"thousands of orders with the intent to cancel them," in contrast to the 14 sequences flagged against Turnbull which constituted "less than 0.03 percent of [his] total trading activity over the period examined." Id. ¶¶ 163, 164. Another trader was indicted based on 38,146 sequences, placing 91 "deceptive orders" in just one of those sequences. Id. ¶ 165. And a supervisor was indicted based on 3,603 sequences, placing 33 "deceptive orders" in a single sequence. Id.

Turnbull also alleges that he was treated more severely than other individuals who were indicted or implicated as co-conspirators. Turnbull alleges that JPMorgan knew about the trading data and chat transcripts of one of its traders who was indicted for spoofing, yet continued to employ that trader even though JPMorgan "used an excerpted chat transcript of his as a training document[] to illustrate dialogue conveying the appearance of manipulative intent," did not subject the trader to discipline, and eventually "released him favorably with severance, a substantial financial award, and other benefits not offered to" the plaintiff. Id. ¶ 179. Another trader who subsequently pleaded guilty to spoofing, and whose trading data and chat transcripts had been "long surveilled" by the defendant, was "released favorably." Id. ¶ 180. JPMorgan recognized that another trader's practices "could be perceived as spoofing" and conducted an internal investigation on that

trader but only issued the trader a verbal warning after
JPMorgan concluded that the trader's conduct did not meet
company standards. Id. ¶ 181. JPMorgan later used examples of
that trader's order sequences as "illustrations of how not to
trade - because the conduct looked like spoofing," but kept that
trader employed until the trader "resigned three years later to
plead guilty to eight years of spoofing." Id. JPMorgan employed
another trader who "attracted multi-year scrutiny from the CME
and CFTC" between 2013 and 2015, and continuing in 2017, when
the trader was suspended and fined by the regulatory boards,
only releasing the trader in 2019 when the trader was indicted
for "thousands of sequences of spoofing" after the indictment
was unsealed. Id. ¶ 183.

The plaintiff alleges that, for each of these traders,
JPMorgan "did not terminate any of those indicted for trading in
a manner that could be perceived as spoofing. Instead, for years
it approved the conduct for continued use, defended it to
regulators, and continued to employ these individuals, releasing
them favorably from the firm or terminating them only as a
result of their indictments." Id. ¶ 186. The plaintiff was not
indicted but was terminated without a severance package. Id.
¶ 190.

In September 2020, the DOJ and JPMorgan entered into a
Deferred Prosecution Agreement ("DPA"), ECF No. 51-5. The DPA

alleges that "Trader 3," who is identifiable as the plaintiff,
was aware of spoofing activities and "engaged in unlawful
trading activity." Id. ¶ 43. The Court takes judicial notice of
the DPA as a public record. See Villella v. Chem. & Mining Co.
of Chile Inc., No. 15-cv-2106, 2017 WL 1169629, at *1 n.2
(S.D.N.Y. Mar. 28, 2017). The Court takes judicial notice of the
DPA not for the truth of its allegations, but for the existence
of the document and of its allegation. Deaton, 2019 WL 4736722,
at *7 n.5.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007). The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985). The Court should not dismiss the complaint if the
plaintiff has stated "enough facts to state a claim to relief
that is plausible on its face." Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the

misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009).

While the Court should construe the factual allegations in

the light most favorable to the plaintiff, it need not accept as

true legal conclusions contained in the complaint. Id. When

presented with a motion to dismiss pursuant to Rule 12(b)(6),

the Court may consider documents that are referenced in the

complaint, documents that the plaintiff relied on in bringing

suit and that are either in the plaintiff's possession or that

the plaintiff knew of when bringing suit, or matters of which

judicial notice may be taken. See Chambers v. Time Warner, Inc.,

282 F.3d 147, 153 (2d Cir. 2002).

### III.

### A.

The plaintiff brings a claim under 18 U.S.C. § 1514A(a)(2).

Section 1514A(a) provides that a covered company and its

employees may not:

> [D]ischarge, demote, suspend, threaten, harass, or in any
> other manner discriminate against an employee in the terms
> and conditions of employment because of any lawful act done
> by the employee —
>
> (1) to provide information, cause information to be
>     provided, or otherwise assist in an investigation
>     [into certain forms of illegal conduct] . . .; or
>
> (2) to file, cause to be filed, testify, participate in,
>     or otherwise assist in a proceeding filed or about to
>     be filed (with any knowledge of the employer) relating
>     to [certain forms of illegal conduct].

A claim under § 1514A(a) requires the plaintiff to show that: "(i) [the plaintiff] engaged in a protected activity, (ii) the employer knew that [the plaintiff] engaged in the protected activity; (iii) [the plaintiff] suffered an unfavorable personnel action; and (iv) the protected activity was a contributing factor in the unfavorable action." Nielsen v. AECOM Tech Corp., 762 F.3d 214, 219 (2d Cir. 2014). The defendant does not dispute that the defendant is a company to which the statute applies. The defendant also does not dispute that the plaintiff engaged in a protected activity, that the plaintiff's termination was an unfavorable personnel action, and that it knew the plaintiff engaged in a protected activity. The defendant disputes only that the protected activity was a contributing factor in the plaintiff's termination.

### B.

The plaintiff argues that the short temporal proximity between the October 7 interview and his termination supports the inference that the protected activity contributed to his termination. A "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Perez v. Progenics Pharms., Inc., 965 F. Supp. 2d 353, 366 (S.D.N.Y. 2013) (noting that protected activity need not be the "primary motivating factor" in the adverse personnel action). Temporal proximity is considered in

14

determining whether the protected activity was a contributing
factor in an adverse personnel action. See Leshinsky v. Telvent
GIT, S.A., 942 F. Supp. 2d 432, 450 (S.D.N.Y. 2013). "[W]here a
plaintiff relies solely on temporal proximity to prove
causation, the protected activity and the plaintiff's
termination must be very close." Id. But "[w]here an employee
provides other evidence indicating a connection between his
protected activity and his termination, . . . courts in this
circuit allow for a more relaxed temporal proximity." Id.

Here, the plaintiff alleges that he was terminated just 24
days after the October 7 interview. The short temporal proximity
between the October 7 interview, where the plaintiff alleges
that JPMorgan learned for the first time the "sum and substance"
of what the plaintiff had disclosed to the DOJ, Compl. ¶ 81,
strongly suggests that the plaintiff's protected activity
contributed to his termination.

The defendant argues that temporal proximity should be
determined from the plaintiff's first meeting with the DOJ in
March 2019. Because the plaintiff was terminated at the end of
October, the defendant argues that a seven-month gap would be
too attenuated to support a finding of temporal proximity.
However, the plaintiff does not allege that the mere fact of his
cooperation with the DOJ led to his termination, but instead
that the defendant terminated the plaintiff because of the

particular "sum and substance" of what he told the DOJ during the October 7 interview. Compl. ¶ 81. The plaintiff argues that the information provided at the October 7 interview was different in kind from information the plaintiff provided in prior interviews because JPMorgan realized, at that interview, that the plaintiff had provided information to the government not only about individual examples of spoofing, but also about JPMorgan's knowledge of those improprieties and its failure of supervision and regulation. Because these disclosures of JPMorgan's regulatory lapses were particularly harmful to the defendant, the plaintiff argues that JPMorgan was incentivized to terminate the plaintiff in order to discredit him.

The defendant says that it never explicitly asked Turnbull what he told the DOJ, and therefore it was implausible that it knew that Turnbull told the DOJ the information revealed in the October 7 interview, and the plaintiff concedes that for the defendant to have so asked "would have constituted a blatant attempt by the Bank to compromise the DOJ investigation." Pl.'s Opp., ECF No. 58, at 12. However, from the circumstances surrounding the October 7 interview and what was revealed to JPMorgan in that interview, it is reasonable to infer that JPMorgan surmised that the plaintiff had also revealed this information to the DOJ. See McCarthy, 482 F.3d at 191 ("In reviewing a motion to dismiss under [Rule 12(b)(6)] . . . we

accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."). Accordingly, for purposes of this motion to dismiss, the October 7 interview is the appropriate event from which to gauge temporal proximity and only 24 days separated the protected activity from the plaintiff's termination.[3]

### C.

The defendant claims that it terminated the plaintiff because he traded in a way that "could have the appearance of spoofing," which "potentially exposed the Bank to regulatory scrutiny." Compl. ¶ 177. The plaintiff argues that this purported reason for his termination was a pretext for the defendant's alleged retaliation for his cooperation with the government.

In other contexts, "[e]vidence that a plaintiff was treated less favorably than similarly situated comparators . . . can

---

[3] In any event, it is not clear that a seven-month gap necessarily forecloses a determination of temporal proximity. The Court of Appeals for the Second Circuit has declined to "define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001). On this basis, the Court of Appeals for the Second Circuit has found temporal proximity despite lengthy time lapses. See, e.g., Summa v. Hofstra Univ., 708 F.3d 115, 127=28 (2d Cir. 2013) (collecting cases and noting that, in those cases, temporal lapses of 6 months and 8 months sufficiently supported causation). When temporal proximity is not the only factor relied on by the plaintiff to show causation, the temporal proximity can be somewhat relaxed. See Leshinsky, 942 F. Supp. 2d at 450.

raise a question of fact as to pretext." Campbell v. Bottling
Grp., LLC, 814 F. App'x 630, 632 (2d Cir. 2020) (Title VII). The
comparators must have engaged in "comparable conduct of
comparable seriousness." Id. at 633.

The plaintiff alleges that he was treated more severely
than multiple comparators, none of whom cooperated with the DOJ.
Compl. ¶ 189. Of the comparators, one trader who was later
indicted by the DOJ remained employed by the defendant even
though the defendant knew of the trader's "trading data and chat
transcripts . . . underl[ying] the charges against him in the
superseding indictment" and used "an excerpted chat transcript
of his as a training document to illustrate dialogue conveying
the appearance of manipulative intent." Compl. ¶ 179. The trader
was released favorably with a severance package and was
subsequently indicted. Id. Another trader, whose trading data
and chat transcripts had been "long surveilled," was released
favorably and then pleaded guilty to spoofing in the following
year. Id. ¶ 180. A third trader, who was recognized as trading
in a way that "could be perceived as spoofing" and whose conduct
did not meet company standards, was only issued a verbal warning
even though "the Bank used examples of his order sequences in
employee training materials as illustrations of how not to trade
– because the conduct looked like spoofing," id. ¶ 181, and
remained employed until he resigned three years later to plead

guilty to spoofing. Another comparator indicted in 2019 for "thousands of alleged instances of spoofing," was terminated by the defendant only "after his indictment was unsealed in September 2019." Id. ¶ 182. Yet another trader, whose conduct "attracted multi-year scrutiny from the CME and CFTC," remained employed by JPMorgan until after his indictment was unsealed. Id. ¶ 183.

All the alleged comparators allegedly engaged in conduct comparable to the plaintiff's conduct — if not more culpable conduct — and all were indicted for or pleaded guilty to spoofing, unlike the plaintiff. Given that the defendant purportedly terminated the plaintiff for the appearance of misconduct, it is unclear why the same rationale should not have applied to the comparators. Yet, the defendants kept the comparators employed long after there were significant issues regarding the appearance of misconduct. On this basis, the plaintiff has alleged sufficiently that the standard of conduct applied to the plaintiff was different from the standard applied to the comparators. See Ashmore v. CGI Group, Inc., 138 F. Supp. 3d 329, 347 (S.D.N.Y. 2015) ("The record is devoid of evidence definitely demonstrating that employees similarly situated to Plaintiff are routinely fired for comparable performance deficiencies or that Plaintiff's conduct contravened a rule customarily leading to immediate termination."). Accordingly,

the plaintiff has plausibly alleged that he was treated less favorably than similarly situated comparators, supporting an inference that the defendant's proffered reason for his termination was pretextual.

The plaintiff's allegation that he was treated less favorably than others is buttressed by the evidence that JPMorgan cites to support the plaintiff's termination. The defendant flagged just 14 of the plaintiff's trading sequences that could be considered spoofing. However, other traders indicted for spoofing — who remained employed by JPMorgan until their indictments were unsealed — were indicted for over thousands of sequences indicative of spoofing. Compl. ¶¶ 165, 183. One such trader was indicted based on 38,146 sequences. Id. ¶ 165. The stark difference in the number of sequences cited against the plaintiff compared to the number of sequences cited as evidence in the indictments strengthens the inference that the defendant's proffered reason for termination was pretextual.

### D.

The defendant also points to the Smith Indictment and the DPA as evidence that the plaintiff committed wrongdoing, and therefore that the defendant's reason for the plaintiff's termination was justified. Although the defendant plausibly proffers that the plaintiff was named as a co-conspirator in the Smith Indictment, and was identified as a wrongdoer in the DPA,

this suggests only that another interpretation of the events may be plausible. Similarly, the defendant argues with some force that it would have been counterproductive for JPMorgan to appear to be retaliating against a witness who was cooperating with the government when JPMorgan had sought to appear cooperative with the government. On the other hand, the plaintiff argues it was in JPMorgan's interest to attempt to discredit a witness who provided evidence of JPMorgan's regulatory failures.

Ultimately, on a motion to dismiss, the plaintiff is only required to "state a claim to relief that is plausible on its face," not to show that the plaintiff's theory of the events is the most or only plausible understanding. Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement."). The plaintiff has plausibly alleged that 24 days separated the protected activity and his termination. This "very close" temporal proximity strongly suggests that his participation in a protected activity was a contributing factor to his termination. Leshinsky, 942 F. Supp. 2d at 450. Moreover, the plaintiff offers greater support for this suggestion by plausibly alleging that he was treated more harshly than similarly situated comparators who did not cooperate with the government, tending to show that the defendant's stated rationale for his termination was pretextual. Together, these proffered facts suggest that the plaintiff's claim is "plausible

on its face." Iqbal, 556 U.S at 678. Accordingly, the
defendant's motion to dismiss is **denied**.

CONCLUSION

The Court has considered all the arguments of the parties.
To the extent not specifically addressed above, the arguments
are either moot or without merit. For the foregoing reasons, the
defendant's motion to dismiss is **denied**. The Clerk is directed
to close all pending motions.

**SO ORDERED.**

Dated:     **New York, New York
            October 17, 2022**

                                                **John G. Koeltl
                     United States District Judge**